United States Court of Appeals,

Fifth Circuit.

No. 94-50043.

HELLER FINANCIAL, INC., Plaintiff-Appellee,

v.

GRAMMCO COMPUTER SALES, INC. and Donald B. Grammer, d/b/a DBG Leasing, Defendants-Appellants.

Jan. 4, 1996.

Appeal from the United States District Court for the Western District of Texas.

Before POLITZ, Chief Judge, and REAVLEY and BARKSDALE, Circuit Judges.

POLITZ, Chief Judge:

Donald Grammer and Grammco Computer Sales, Inc. appeal a judgment in favor of Heller Financial, Inc. on its civil RICO, fraud, and contract claims. We affirm in part and reverse in part.

BACKGROUND

In 1979 Grammer left his position as a computer sales representative with IBM, Inc. to start Grammco Computer Sales, Inc., a company specializing in the marketing and leasing of computer equipment. Shortly after organizing Grammco, Grammer solicited the business of the Santa Rosa Medical Center in San Antonio, Texas which, through its director of information systems, Joseph Dixon, began leasing computer equipment exclusively from Grammco. No competitive bids were solicited. This exclusive relationship continued for the next eight years and, by 1986, resulted in a total of 54 Grammco leases at a monthly cost of $124,000.

In 1987 Santa Rosa reexamined its lease obligations with a view to reducing costs. Grammer proposed consolidating the existing leases into a single 36-month lease with a monthly payment of $84,841, thereby reducing Santa Rosa's monthly payments by approximately $40,000. This proposal included an option which allowed Santa Rosa to purchase the equipment at the end of the lease term for a nominal sum. Santa Rosa accepted the proposal and, on May 20, consolidated its leases into a single lease denominated L3177. Grammer, d/b/a DBG Leasing, then purchased this lease and all rights Grammco held in the leased equipment for 1.2 million dollars.

Grammer obtained financing for this transaction through Heller Financial, Inc., a company with which Grammco had financed lease transactions in the past. Prior to the formation of the new consolidated lease, Heller informed Grammer that it could not extend a loan secured by a lease containing a purchase option in its terms without substantial modification of the loan documents. Grammer represented that the new lease would not contain a purchase option and that modification of the documents would not be necessary. With this understanding, Heller agreed to extend Grammer a 2.65 million dollar loan on a non-recourse basis, taking a security interest in Grammer's rights to the leased equipment and the lease income stream. Grammco agreed to guarantee the loan to Grammer.

As part of the loan closing process, Grammer pro vided Heller with an "original" of lease L3177; this "original," however, did not include the purchase option that had been included in the lease signed by Grammco and Santa Rosa. Grammer also entered a Master Security Agreement pledging the leased equipment and lease income stream as security for the loan. In this agreement, Grammer warranted that he: (1) had good title to the leased equipment; (2) had provided Heller with all documents related to L3177; (3) had granted Heller a first, prior, and perfected security interest in all collateral; and (4) would not modify the terms of the lease without the express approval of Heller. After reviewing the lease provided by Grammer and the Master Security Agreement, Heller formally approved the loan, closing the loan on June 15 and releasing the funds to Grammer on June 26. Heller received the income from the lease as payment on the loan for the next four months.

In the summer of 1987 a change in management at Santa Rosa prompted a review of computer equipment expenditures. The review revealed that Santa Rosa was paying well-above market rates on its computer lease with Grammco. Because the lease contained a purchase option, Santa Rosa viewed L3177 as an installment sales contract rather than a true lease; moreover, it concluded that the high rates on the lease were usurious and violated Texas usury laws. Santa Rosa stopped making payments on the lease to Heller, arranged to dismiss Joseph Dixon,[1] and filed suit

---

[1]Santa Rosa decided to terminate Dixon, but Dixon resigned before Santa Rosa officially terminated him.

against Grammer d/b/a DBG Leasing, Grammco, and Heller alleging that L3177 was a usurious installment sales contract.

During the ensuing litigation in Texas state court,[2] Heller and Santa Rosa uncovered monthly payments from Grammer to Dixon starting in September of 1983 and continuing until Dixon's departure from Santa Rosa in October of 1987. Grammer maintained that these payments compensated Dixon for computer programming services he performed for Grammco. Those services, however, were later valued at approximately $15,000 while the payments totaled $171,804. Heller and Santa Rosa also uncovered Dixon's participation in a series of lease transactions with Grammer that provided significant tax benefits to Dixon at no cost and Dixon's receipt of $14,900 in royalties from Grammer for sales of computer shelving equipment that Dixon had designed. On the basis of this information, Santa Rosa amended its complaint to include a claim of commercial bribery against Grammer, Grammco, and Dixon.

Heller also discovered that lease L3177 contained a purchase option and that ICS Cybernetics, another computer vendor, owned the central processing unit of the computer equipment leased to Santa Rosa. Thus, Heller realized that despite Grammer's warranties to the contrary, Grammer did not have title to the leased equipment. Heller, codefendant with Grammer and Grammco on the usury claim, filed a cross-claim against Grammer and Grammco for breach of contract and a counter-claim against Santa Rosa for recovery of sums due under the lease.

To avoid actions that could be construed as illegal "charging" of usurious interest, Heller nonsuited its counter-claim against Santa Rosa; Heller then received summary judgment on Santa Rosa's usury claim against it. As the remaining claims headed to trial, Heller nonsuited its cross-claim against Grammer and Grammco. Subsequently, Santa Rosa, Grammer, Grammco, and Dixon reached a settlement whereby Santa Rosa received title to all of the lease equipment, 1.7 million dollars from Grammco, $7500 from Dixon, and entry of a judgment stating that Santa Rosa had satisfied the terms of the lease and that the lease was terminated.

After final judgment in the Santa Rosa litigation, Heller filed the instant action in federal court

---

[2]Referred to herein as the "Santa Rosa litigation."

against Grammer and Grammco alleging breaches of the warranties found in the Master Security Agreement, breach of contract on the loan guarantee, fraud in inducing Heller to make the loan, and violations of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(a) and (c). By consent of the parties, the district court referred the case to a magistrate judge for a jury trial.[3]

Prior to trial the court issued an order prohibiting Grammer and Grammco from introducing evidence at trial regarding Heller's failure to mitigate damages, impairment of collateral, and waiver of claims. At the close of the defendants' case, the court instructed a verdict in Heller's favor on one of the breach of warranty claims. The jury returned a series of special verdicts for Heller on the fraud, contract, and civil RICO claims. The court rendered judgment for Heller against Grammer d/b/a DBG Leasing in the amount of $14,665,866.63 plus costs and attorneys' fees for violating RICO § 1962(a). The judgment outlined three alternative awards against Grammer: 1) $1,950,446.01 plus costs and attorneys' fees for violating RICO § 1962(c); 2) $1,650,148.67 with prejudgment interest on that amount from September 13, 1987 at the rate of 10% per annum and $2,000,000 in punitive damages plus costs for fraud; and 3) $4,888,622.21 plus costs and attorney's fees for breach of warranty. The court rendered judgment against Grammco for $4,888,622.21 plus costs and attorneys' fees for breach of the guarantee of Grammer's loan.

Grammer and Grammco timely appealed.

*Analysis*

I. *Res Judicata*

Grammer and Grammco first seek to dispose of all of Heller's claims on the ground that Heller could have asserted these claims in the earlier Santa Rosa litigation and that principles of *res judicata* therefore now bar Heller's assertion of these claims. We disagree. Under Texas *res judicata* principles,[4] a prior judgment precludes a claim only if the parties are identical, the prior judgment was

---

[3]28 U.S.C. § 636(c).

[4]Because final judgment in the Santa Rosa litigation was rendered in a Texas state court, Texas law governs the application of *res judicata* based on that earlier judgment. *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274

rendered by a court of competent jurisdiction and was a final judgment on the merits, and the challenged claim arises out of the same subject matter litigated in the first suit.[5]

Grammer and Grammco maintain that all prerequisites for *res judicata* have been met although they acknowledge that codefendants in an action, as were Heller and Grammer and Grammco in the Santa Rosa litigation, are not considered adverse parties for purposes of *res judicata.*[6] Grammer and Grammco would avoid this bar by contending that once Heller asserted its cross-claim it became an adverse party. We agree that the filing of the cross-claim made Heller an adverse party,[7] but Heller's subsequent nonsuit of the cross-claim returned the parties to the same position as if the claim had never been filed.[8] Therefore, Heller was not adverse to Grammer and Grammco when the agreed judgment was entered and *res judicata* does not operate to bar Heller's claims in this action.

## II. *RICO Claims*

Grammer next contends that Heller failed to establish that Grammer's alleged acts of commercial bribery and mail and wire fraud amount to a "pattern of racketeering activity" as required to support a verdict for violations of § 1962(a) or (c). Because Grammer appeals from a denial of his post-verdict motion for judgment as a matter of law, we review this appeal using the same standard as the district court; factual issues are reviewed only for the presence of substantial evidence supporting the verdict while legal issues are reviewed de novo.[9]

---

(1985); *Rollins v. Dwyer,* 666 F.2d 141 (5th Cir.1982).

[5]*Barr v. Resolution Trust Corp.,* 837 S.W.2d 627 (Tex.1992); *Holloway v. Starnes,* 840 S.W.2d 14 (Tex.Ct.App.1992), cert. denied, --- U.S. ----, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993).

[6]*Getty Oil v. Ins. Co. of N. America,* 845 S.W.2d 794, 800 (Tex.1992) ("[R]es judicata applies only to adverse parties."), cert. denied, --- U.S. ----, 114 S.Ct. 76, 126 L.Ed.2d 45 (1993).

[7]*Id.* ("[W]here a defendant does assert a cross-claim against a co-party, they become adverse, and the principles of res judicata apply.").

[8]*Alvarado v. Hyundai Motor Co.,* 885 S.W.2d 167, 174 (Tex.Ct.App.1994) (citing *Crofts v. Court of Civil Appeals,* 362 S.W.2d 101 (Tex.1962)), rev'd on other grounds, 892 S.W.2d 853 (Tex.1995).

[9]*Robertson v. Bell Helicopter Textron, Inc.,* 32 F.3d 948 (5th Cir.1994).

To prove a "pattern of racketeering activity" under § 1962(a) and (c), Heller had to prove "at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity."[10] In *H.J. Inc. v. Northwestern Bell Telephone Co.,*[11] the Supreme Court clarified and narrowed this statutory definition, holding that "to prove a pattern of a racketeering activity a plaintiff ... must show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity."[12] "It is this factor of continuity plus relationship which combines to produce a pattern."[13] Although proof of continuity and relationship may often overlap, the two inquiries analytically are distinct prongs of the pattern element requiring separate analysis.[14]

Grammer asserts that Heller failed to demonstrate that the allegations of commercial bribery and mail and wire fraud satisfied either prong of the pattern requirement. We, however, need only address Heller's satisfaction of the relationship prong of the pattern requirement.[15] The relatedness inquiry "focuses on the interrelationship of charged RICO predicates,"[16] thereby ensuring that a person is not "subjected to sanctions for committing two widely separated and isolated criminal

---

[10]*United States v. Carlock,* 806 F.2d 535, 542 (5th Cir.1986), *cert. denied,* 480 U.S. 949, 950, 107 S.Ct. 1611, 1613, 94 L.Ed.2d 796, 798 (1987).

[11]492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

[12]*Id.* at 239, 109 S.Ct. at 2900.

[13]*Id.*

[14]*Id.*

[15]Normally, the existence of a sufficient relationship between the predicate acts is either obvious or assumed and our review focuses on the continuity requirement. *See e.g., Calcasieu Marine Nat'l Bank v. Grant,* 943 F.2d 1453 (5th Cir.1991). We reverse that approach here in light of Heller's complete reliance on the evidence of Grammer's bribery of Santa Rosa employee Joseph Dixon to support a finding of continuity. Even if we assume that this bribery activity independently provides sufficient continuity for a RICO "pattern," such a pattern can not support Heller's claim unless Heller demonstrates that the predicate acts causing its injury, the mail and wire fraud, are sufficiently related to the predicate acts of bribery to be part of the same racketeering pattern. *See Vild v. Visconsi,* 956 F.2d 560 (6th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992).

[16]*United States v. Eufrasio,* 935 F.2d 553, 564-65 (3d Cir.1991), cert. denied, 502 U.S. 925, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).

offenses."[17]  A plaintiff can satisfy the relationship requirement by demonstrating that the alleged predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events."[18]

Examining the predicate acts alleged by Heller within this framework, we conclude that they are not sufficiently interrelated to constitute a pattern of racketeering activity.  Heller essentially complains of two types of criminal activity:  Grammer's alleged commercial bribery of Santa Rosa employee Joseph Dixon and his use of the mail and wires to fraudulently induce Heller into extending him credit.  According to Heller's pleadings, the purpose of the bribery scheme was to maintain Grammco's exclusive business relationship with Santa Rosa free of competition that might have caused Santa Rosa to take its computer business elsewhere.  The alleged mail and wire fraud, on the other hand, sought to induce Heller into making a loan on terms that would have not otherwise been available.[19]  The purposes of the alleged predicate acts were distinct and dissimilar.

The predicate acts also had dissimilar results.  The bribery resulted in Santa Rosa's payment of excessive prices on its leases of computer equipment while the mail and wire fraud resulted in the extension of a loan on terms offering less protection to Heller than Heller normally required.  This conclusion is reinforced by an examination of the injuries of the "victims" of the alleged criminal activity.  By paying the higher lease rates Santa Rosa lost those sums paid in excess of the market rate;  Heller suffered a default on a loan and the loss of payments not yet made.

The difference in the "methods of commission" further supports our conclusion that the alleged predicate acts were not related.  The bribery of Santa Rosa employee Joseph Dixon eliminated competitive pressures by causing Dixon to betray his fiduciary relationship with Santa Rosa.

---

[17]Id. at 565 (citing *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900-01 (quoting from legislative history) (citations omitted)).

[18]*Calcasieu,* 943 F.2d at 1463 (quoting *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901).

[19]Heller's witnesses testified that the loan to Grammer could have been made with the purchase option but that Heller would have required significant modifications in the terms of the loan and security agreement.

Grammer defrauded Heller by refusing to disclose material aspects of the lease serving as security for the loan. It is manifest that the alleged activities involved not only substantively different crimes but also functionally different methods of commission.

We also note that the participants in the two types of criminal activity alleged by Heller were different. The bribery activity included Santa Rosa employee Dixon, a principal player in the scheme without whom the bribery could not have taken place. Only Grammer participated in the alleged fraud on Heller; neither Dixon nor a substitute intermediary participated in or was necessary to the fraud.

Finally, we note that the two types of conduct which Heller seeks to connect into a pattern were directed at different victims. Grammer's bribery of Dixon directly affected only Santa Rosa while his fraudulent acts injured only Heller. We do not consider Heller and Santa Rosa to be similarly situated victims; Santa Rosa occupied the position of a consumer of Grammer's services while Heller served as Grammer's creditor.

In an effort to make out some relationship between the acts, Heller maintains that Grammer's bribery allowed the extraction of supra-competitive profits from its Santa Rosa leases, one of which leases Grammer then used as collateral for the fraudulently induced loan. Heller contends that by using the lease as collateral for the loan, Grammer immediately reaped the profits of his fraud on Santa Rosa rather than doing so over time and thereby insulated himself from the consequences of Santa Rosa's discovery of the bribery. We are not persuaded.

Although we recognize that a plaintiff can satisfy the relationship requirement by demonstrating that the alleged predicate acts "are interrelated by distinguishing characteristics" other than those outlined above, we interpret the relationship prong of the pattern requirement to require more than an articulable factual nexus.[20] We take the clear import of the Supreme Court's admonition in *H.J. Inc.* to consider whether the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission" to require that a RICO plaintiff must prove a

---

[20]*See Vild* (holding fraud against marketer of real estate development to be "unrelated" to fraud against the targeted consumers of the development); *McLaughlin v. Anderson,* 962 F.2d 187 (2d Cir.1992).

relationship between the criminal aspects of the predicate criminal acts, thereby supporting the conclusion that the criminal acts are " "ordered' or "arranged.' "[21]

Heller would paint with too broad a stroke. The "reaping the profits" theory describes every lease financing loan, whether that loan involved mail or wire fraud. Through such financing, a lessor finances his own acquisition of the leased or sold goods and realizes his profit while the debt service on the financing is satisfied by the payments from the account debtor (consumer), all of which is a purely legitimate business pursuit. Nothing in this scenario or in the evidence suggests that Grammer's fraudulent acts were related to his bribery of Dixon.[22]

Finding the fraud and the bribery to be unrelated, we must conclude that Heller has failed to demonstrate that Grammer's acts against it were part of a pattern of racketeering activity. The verdicts on Heller's RICO claims must therefore be reversed.[23]

III. *Breach of Warranty*

Grammer next challenges the verdicts on Heller's claims that Grammer breached warranties made in the security agreement executed contemporaneously with his loan from Heller. He first asserts that the district court erred in instructing the jury that Grammer breached his warranty not to modify the lease when he entered the settlement agreement releasing Santa Rosa from all of its obligations under the lease, including its obligation to make payments.[24] Grammer contends that any such modification could not affect Heller's rights against Santa Rosa and that Heller therefore suffered

---

[21]*H.J. Inc.,* 492 U.S. at 238, 109 S.Ct. at 2900.

[22]In so holding, we attempt to give some meaning to the relationship prong of the pattern requirement. The "test" stated by the Supreme Court for the relationship prong is "admittedly difficult to apply," *Banks v. Wolk,* 918 F.2d 418, 424 (3d Cir.1990), but that difficulty does not allow us to ignore its effect. To allow a finding of relationship on the facts of this case would effectively eliminate any meaningful relationship requirement. We interpret the Supreme Court's teaching in *H.J. Inc.* that the relationship prong is "analytically distinct" to make that an untenable result. *See Vild.* We leave to future panels the task of further defining the limits of this test.

[23]Because Heller fails to make out a pattern of racketeering as required to support any RICO claims, we need not consider Grammer's other assignments of error on the RICO claims.

[24]The trial court held that this modification contemporaneously breached Grammer's warranty that the obligation of Santa Rosa to make payments on the lease would remain absolute and unconditional and not subject to any claims or rights against Grammer.

no damages as a result of the modification.

We first note that the security agreement containing the subject warranties includes a choice of law provision designating the law of Illinois as controlling the interpretation of the agreement.[25] Under Illinois law, a security agreement is a contract interpreted by reference to Article 9 of the Commercial Code, if applicable, otherwise, by reference to the law of contracts.[26]

The starting point for our analysis of the security agreement is, of course, its plain language.[27] Paragraph 3(n) of the agreement states that the "Debtor (Grammer) will not make any modifications to any Lease without the prior written consent of Secured Party (Heller)." In the event that this or other warranties are breached by Grammer, the agreement provides that Grammer is then considered in default and fully liable for "any loss or damage incurred or suffered by Secured Party (Heller), arising out of or in connection with the breach." Although these provisions clearly allow Heller to bring a claim against Grammer for a breach of warranty,[28] Grammer contends that the modification of the lease is not the proximate cause of the damages which Heller seeks to recover, namely the balance due and owing on the underlying note to Grammer.

"A person breaching a contract can be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof in light of the facts known or which should have been known or such as may reasonably be supposed to have been within the

---

[25]Ill.Rev.Stat. ch. 26 para. 1-105. Because the transaction, whether characterized as a conditional sale or a lease, created a security interest, the transaction is governed by Article 9 of the Uniform Commercial Code as adopted in Illinois. *See* Ill.Rev.Stat. ch. 26 para. 9-102.

[26]Ill.Rev.Stat. ch. 26, para. 1-201(3).

[27]*Bysom Enterprises, Ltd. v. Peter Carlton Enterprises, Ltd.,* 267 Ill.App.3d 1, 204 Ill.Dec. 408, 414, 641 N.E.2d 838, 844 (1994) ("The parties' intent as to the scope of a contract is irrelevant where the language of the contract is clear and unambiguous."), appeal denied, 159 Ill.2d 564, 207 Ill.Dec. 514, 647 N.E.2d 1007 (1995).

[28]Grammer contends that any modification he made was not binding on Heller because Grammer had already assigned the lease to Heller and that Heller therefore should have sought recovery from Santa Rosa. The evidence, however, supports only the conclusion that Grammer assigned his right of payment to Heller. The only agreements between Heller and Grammer of which there is evidence are Grammer's promissory note and the related security agreement. Grammer's notification of assignment to Santa Rosa can not support a finding of an assignment of the lease; it provides no evidence of an agreement on the part of Heller.

contemplation of the parties as a probable result of a breach thereof."[29]  Common sense dictates that if the lessor releases the lessee from making payments on the note, the lessee's failure to make those payments naturally arises from and is connected to the lessor's release.[30]  Further, a review of the agreement and the underlying promissory note lead us to conclude that the damages were precisely those contemplated by the parties in the event of a breach of the warranty against modification. Paragraph 3(n), which sets forth the warranty against modification, specifically discusses the amount of the reduction in payments to Heller from the lessee as the proper measure of damages after a modification.  In Grammer's pro missory note, the parties agree that in the case of a breach of warranty, Grammer would be liable for the payment of the principal.

We also reject Grammer's argument that Heller should have sought recovery of the balance due on the note from Santa Rosa.  Whether Heller could have pursued an action against Santa Rosa for the payments on the note is irrelevant to our inquiry into the existence of a cause of action against Grammer.  The Illinois Commercial Code section governing modifications after assignments of rights to payment specifically provides that the parties can agree to make a modification of the underlying contract (the lease) a breach by the assignor of the right.[31]  The parties here manifested such an intention in the security agreement.  Accordingly, we conclude that the damages sought by Heller were proximately caused by the breach of the warranty against modification and that the trial court's directed verdict on this issue was not erroneous.

IV. *Adjustment of Damage Award*

Grammer next argues that even if the breach of warranty judgment stands, the trial court erred in increasing the damage award on this claim from the jury's award of 1 million dollars to 4.7

---

[29]*Case Prestressing Corp. v. Chicago College of Osteopathic Medicine,* 118 Ill.App.3d 782, 74 Ill.Dec. 382, 387, 455 N.E.2d 811, 816 (1983).

[30]*See Bysom Enterprises, Ltd.* (rejecting argument similar to Grammer's in context of breach of an express warranty).

[31]Ill.Rev.Stat. ch. 26 para. 9-318.  *See Bank One, Texas, N.A. v. Communication Specialists, Inc.,* 813 S.W.2d 755 (Tex.Ct.App.1991) (commenting on same provision under Texas Commercial Code).  *Cf. Southern Rock, Inc. v. B & B Auto Supply,* 711 F.2d 683 (5th Cir.1983) (interpreting security agreement to create security interest in accounts rather than a complete assignment of title to those accounts).

million dollars, the balance due on the underlying debt. We accord a jury great discretion in awarding damages within the range shown by the evidence.[32] In the infrequent circumstance where there is no rational basis for the jury's verdict, however, a trial court may impose the only damages award that reasonably can be drawn from the evidence.[33]

The only evidence of damages at trial was testimony by Heller witness John Payne who placed the damages at the balance due on the underlying debt. Although Grammer contends that he presented extensive evidence showing that he cured most of the breaches of which Heller complains, he points to no evidence supporting the conclusion that the breach of the warranty against modification caused damages less than the balance due on the debt.[34] We perceive no error in the trial court's amendment of the judgment; the record is devoid of any evidence allowing a lesser verdict on the breach of warranty claim.

V. *Fraud*

Grammer asserts that Heller can not recover for fraud when that claim arises from the same transaction supporting the successful breach of contract claim. Contending that Heller simply recast one of its breach of warranty claims into a fraud claim, Grammer maintains that the jury's fraud verdict and its associated award of punitive damages can not stand.

As a general rule, "the failure to perform the terms of a contract is a breach of contract, not a tort."[35] This statement, however, belies the difficulty the Texas courts and this court have had in

---

[32]*Neiman-Marcus Group, Inc. v. Dworkin,* 919 F.2d 368 (5th Cir.1990).

[33]*See Shaffer v. Great American Indemnity Co.,* 147 F.2d 981 (5th Cir.1945) (allowing substitution when only one damage amount is possible if liability attaches); *United States v. Kennesaw Mountain Battlefield Ass'n,* 99 F.2d 830 (5th Cir.1938), cert. denied, 306 U.S. 646, 59 S.Ct. 587, 83 L.Ed. 1045 (1939); *Texas Compensation Ins. Co. v. Heard,* 93 F.2d 548 (5th Cir.1937).

[34]Even if we assume that the evidence to which Grammer points justifies a lower damage award, that evidence is relevant only to the warranties of title, prior perfected interest, and provisions of all relevant documents. *See* Security Agreement ¶ 3(a), 3(c), and 3(g).

[35]*Schindler v. Austwell Farmers Co-op.,* 829 S.W.2d 283, 289 (Tex.Ct.App.—Corpus Christi 1992), *aff'd as modified,* 841 S.W.2d 853 (Tex.1992); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986). The parties agree that Texas law governs Heller's fraud claim.

determining when a party may assert a tort action in addition to a contract action.[36]  In *Southwestern Bell Tel. Co. v. DeLanney,*[37] the Texas Supreme Court cleared up some of the confusion by endorsing a two step inquiry for such determinations.  First, a court should examine the faulted conduct to determine if it violates duties imposed by law, independent of those duties imposed by the contract.  Next, it should examine the nature of the alleged injury, recognizing that "[w]hen the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone."[38]

The first inquiry militates in favor of allowing Heller's fraud claim.  Heller essentially claimed and proved at trial that Grammer induced Heller to extend him a loan by misrepresenting material facts regarding the presence of a dollar purchase option in lease L3177 and Grammer's ownership of the leased equipment.  Texas courts have held that when one party misrepresents a material fact to induce another to enter an otherwise normal contract, the induced party may assert an action for fraud based on duties imposed separate and apart from the contract.[39]

The second inquiry is more troublesome.  Heller's asserted injury, both in its pleadings and as reflected by evidence adduced at trial, was the balance due on the defaulted note;  indeed, Heller notes in brief that the default amount was the only evidence of damages even presented to the jury.  The posited injury, then, is that payments Heller was promised were never received—precisely the subject of the contract.  Although fraud damages may be measured in "benefit of the bargain" terms,[40] the Texas courts are split on the issue whether these damages must be independent from damages for

---

[36]*See Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex.1991) ("We have muddled the law of "contorts' and an all encompassing bright line demarcation of what constitutes a tort distinct from breach of contract has proven to be elusive.")  (Gonzalez, J. concurring).  The matter is further complicated in this instance by the non-recourse nature of the underlying promissory note.  Thus, the co-existing breach of contract claim is based on the security agreement which incorporates the promissory note.

[37]809 S.W.2d 493 (Tex.1991).

[38]*Jim Walter Homes,* 711 S.W.2d at 618.

[39]*See Trenholm v. Ratcliff,* 646 S.W.2d 927 (Tex.1983) (tracing damages to losses on resale after misrepresentation induced contract for sale).

[40]*American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274 (Tex.1990).

the breach of the contract affected by the fraud.[41] The majority of the Texas cases appear, however, to require proof of some damages beyond the economic losses to the subject matter of the contract. Bound as we are by Texas law on this issue, and finding no damages attributable to the fraud rather than the contract, we perforce must conclude that Heller is not entitled to a verdict on its fraud claim.[42] Because Heller's fraud claim is necessary to support a finding of punitive damages, the award of punitive damages must also be vacated.[43]

## VI. *Exclusion of Evidence*

Grammer finally contends that the district court erred in excluding his evidence that Heller failed to mitigate its damages, impaired the collateral for the loan, that collateral being the right to lease payments, and waived its claims against him. Citing sections 3-606 and 9-207 of the Illinois Commercial Code, Grammer maintains that Heller, as a secured party in possession of collateral, had to act in a commercially reasonable manner to preserve the value of collateral.[44] Grammer contends that Heller failed to so act when it nonsuited its claims against Santa Rosa and that Grammer was therefore entitled to a special issue regarding possible impairment of the collateral and failure to

---

[41]*National Union Fire Ins. Co. v. Care Flight Ambulance,* 18 F.3d 323, 327 n. 1 (5th Cir.1994) (noting split and collecting cases). *Compare Hebisen v. Nassau Dev. Co.,* 754 S.W.2d 345 (Tex.Ct.App.—Houston [14th Dist.] 1988) (no claim of fraud when only damages are to the subject of the contract) and *Schindler* (no requirement that separate injuries be shown to support fraud claim).

[42]Heller cites *Schindler v. Austwell Farmers Co-op.,* for the proposition that damages directly attributable to the fraud need not be shown. That case, however, dealt with the fraudulent inducement of a contract where the inducing party never intended to perform. In that instance, we agree that the law of Texas is that the action will support a fraud claim as well as a contract claim. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432 (Tex.1986). The instant suit deals with a material misrepresentation inducing a contract the parties intend to perform. On those facts, the majority rule appears to be that separate damages must be proven.

We recognize that this holding gives a narrow reading to our decision in *National Union Fire Ins. Co.* where we held that a party could assert a conversion claim in addition to a contract claim. That decision relied on the fact that no Texas cases had ever required separate damages for the conversion claim. 18 F.3d at 327-28. In the case of fraud claims, however, the majority of the precedent requires separate damages.

[43]*See Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901 (Tex.1986) (contract claim alone cannot support punitive damages). Because we conclude that the fraud verdict can not stand, we need not address Grammer's challenge to the award of prejudgment interest on the fraud damages.

[44]Ill.Rev.Stat. para. 3-606 & 9-207.

mitigate damages. Grammer further contends that under section 3-606, Heller's nonsuit of its claims against Santa Rosa discharged *pro tanto* Grammco's liability on its guaranty of Grammer's note and that this point further warranted the admission of evidence on the mitigation issue.

At the outset we note that we will reverse a trial court's evidentiary rulings only if they prejudiced a substantial right of the complaining party.[45] Grammer's arguments rely on the assumption that Heller was obligated to pursue the collateral for the lease then held by Santa Rosa after Santa Rosa ceased making payments. The Illinois Commercial Code clearly provides, however, that a secured party has the choice of pursuing a judgment against the debtor (Grammer) on default rather than the collateral, in addition to the collateral, or in combination therewith.[46] We therefore agree with the trial court that evidence of Heller's decision to nonsuit its claims against Santa Rosa was irrelevant to the claims litigated at trial.

To the extent that Grammer argues Heller's nonsuit of Santa Rosa injured him by impairing his rights in the lease income stream, we are not persuaded. Sections 3-606 and 9-207 are designed to protect the rights of sureties to act on the collateral after satisfying a debt owed to the secured party.[47] Grammer and Grammco, however, gave up any rights in L3177 when they entered the settlement agreement with Santa Rosa. Thus, there was nothing for Heller to impair through its acts.[48]

Finally, we reject Grammer's argument that the trial court erred in excluding Grammer's

---

[45]Fed.R.Evid. 103; *E.E.O.C. v. Manville Sales Corp.,* 27 F.3d 1089, 1093 (5th Cir.1994) ("In order to vacate a judgment based on an error in an evidentiary ruling, "this court must find that the substantial rights of the parties were affected.' ") (citing *Carter v. Massey-Ferguson, Inc.,* 716 F.2d 344, 349 (5th Cir.1983)), cert. denied, --- U.S. ----, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995).

[46]Ill.Rev.Stat. ch. 26, para. 9-501.

[47]*See North Bank v. Circle Investment Co.,* 104 Ill.App.3d 363, 60 Ill.Dec. 105, 432 N.E.2d 1004 (1982).

[48]*See Ramsey v. First Nat. Bank and Trust Co. of Corbin,* 683 S.W.2d 947 (Ky.Ct.App.1984) (discussing purpose of impairment of collateral defense). We also note that Grammer's claims of failure to mitigate and impairment of collateral depend upon Heller's possession of the lease income stream. The evidence introduced at trial also supports the conclusion that Heller never received all the documents making up L3177 and therefore was arguably never in possession of the lease income stream as contended by Grammer.

evidence regarding Heller's alleged waiver of its claims against Grammer by failing to object or participate in Grammer's settlement discussions with Santa Rosa. Assuming, *arguendo,* that the trial court erred in granting a motion in limine on evidence related to this alleged waiver, the record reflects that the parties did in fact introduce evidence regarding the settlement and that such evidence overwhelmingly supports the conclusion that no waiver occurred.[49] We perceive no prejudice to a substantial right.

We REVERSE the judgment in favor of Heller on the RICO claims and the fraud claims. We AFFIRM the judgment on the breach of warranty claims.

REAVLEY, Circuit Judge, concurring:

I concur in the result reached by the majority, but I differ in the RICO analysis.

In *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Court held that a "pattern of racketeering activity" embraced both a "relationship" requirement and a "continuity" requirement. As to the relationship requirement it concluded that "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, *or* methods of commission, *or otherwise* are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (emphasis added). Particularly when read in context, I believe that the Court intended this relationship requirement to be a minimal one. The Court recognized concerns that RICO has too broad a sweep and was being used to pursue "legitimate" businesses as well as organized criminals, but concluded that this result is compelled by the expansive language of the statute, and the failure of Congress to scale it back. *Id.* at 235-37, 109 S.Ct. at 2899. It concluded that "the legislative history shows that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime." *Id.* at 246, 109 S.Ct. at 2904. The Court rejected an Eighth Circuit requirement that a "pattern of racketeering activity" requires *multiple* illegal schemes, as opposed to a single fraudulent effort or scheme. *Id.* at 233-34, 109 S.Ct. at 2898-99. It concluded instead that

---

[49]*See First Interstate Bank v. Interfund Corp.,* 924 F.2d 588 (5th Cir.1991) (noting that waiver requires proof of an unequivocal intention to no longer assert the right in question).

"Congress indeed had a fairly flexible concept of a pattern in mind." *Id.* at 239, 109 S.Ct. at 2900.

I would hold that Grammer's conduct met this relationship requirement. The predicate acts included (1) repeated bribes to Dixon, (2) misrepresenting to Heller that there was no purchase option, and (3) misrepresenting to Heller that Grammer owned the equipment. These acts are not isolated events; they are related because they were all part of an ongoing scheme by Grammer to obtain the benefits of an above-market lease by deceiving the hospital and his lender. The loan facilitated this scheme by allowing Grammer to receive cash up front, thereby insulating him from a loss should the bribery later be discovered.

However, Grammer argues as a separate ground for rejecting the § 1962(a) RICO judgment, not reached by the majority opinion, that Heller did not prove an "investment injury." I agree. Section 1962(a) makes it "unlawful for any person who has received any income derived ... from a pattern or racketeering activity ... to *use or invest* ... any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise...." 18 U.S.C. § 1962(a). We have held that a civil recovery under § 1964(c) premised on a violation of § 1962(a) requires the plaintiff to prove that his injury was caused by the defendant's use or investment of racketeering income. "[A]ny injury under section 1962(a) must flow from the use of investment of racketeering income." *Parker & Parsley Petroleum Co. v. Dresser Indus.,* 972 F.2d 580, 584 (5th Cir.1992). *Accord, Crowe v. Henry,* 43 F.3d 198, 205 (5th Cir.1995) ("For subsection (a), this means that the injury must flow from the investment of racketeering income into the enterprise."). I agree with the majority that Heller's only evidence of damages was the unpaid amounts due on the note. Heller's injury did not flow from the manner in which Grammer invested or used the loan proceeds once he had obtained them by false pretenses. Heller did not tie its injury to Grammer's use or investment of the loan, but instead claimed injury only on the basis of the initial act of making the loan to Grammer. Likewise, Heller did not establish that the bribes to Dixon caused Grammer to receive income and then invest or use that income in a manner that caused injury to Heller. Heller did link Grammer's use of the income from the leases, about which there was little if any evidence presented

at trial, to Heller's decision to make its loan to Grammer.[1]

Furthermore, I reluctantly concur in the holding on punitive damages. We must follow Texas law, no matter what we think of it. I understand why the breach of a duty arising out of the terms of a contract, where the damages are measured precisely by the contract, may be treated as the predicate for an action on the contract rather than as an independent tort. However, proof of the elements of a cause of action for fraud should certainly establish an independent tort, whether or not the amount of actual damages would be the same if the claim were for breach of contract. But if the Texas courts dislike punitive damages so much as to decree that law, I am *Erie* bound to it.

---

[1]As the majority points out, Heller also won a judgment based on § 1962(c) of RICO. Unlike § 1962(a), this subsection does not require a defendant's use or investment of racketeering income, but instead makes it "unlawful for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity...." I need not consider whether the § 1962(c) judgment should stand even if the majority agreed with me that the relationship requirement (which applies to both §§ 1962(a) and (c)) was met here. First, the district court clearly awarded this judgment in the alternative to the larger breach of warranty judgment. Heller makes no argument that the district court erred in awarding these judgments in the alternative rather than stacking them, and makes no argument that the jury (which awarded only $500,000 under § 1962(c)) or the court erred in calculating damages under § 1962(c). Even after trebling by the court the § 1962(c) judgment was still smaller than the breach of warranty judgment, and Heller should be deemed to have elected the larger judgment. Second, as explained above, Heller's only proof of damages was the unpaid balance on the note. Since the breach of warranty judgment awards the full amount due on the note, adding the § 1962(c) judgment to the breach of warranty judgment would amount to a double recovery. *See Alcorn County v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160, 1171 (5th Cir.1984) (noting that "duplicative damages [under RICO and state common law] should not be allowed.").