**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 01-20106

PARKANS INTERNATIONAL LLC,

Plaintiff-Counter Defendant-Appellee,

VERSUS

ZURICH INSURANCE CO.

Defendant-Counter Claimant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

August 5, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

DUHÉ, Circuit Judge:

Defendant Zurich Insurance Company issued plaintiff Parkans International, L.L.C., a Commercial Package Policy of primary insurance including crime coverage, and an excess Custom Cover Policy ("CCP"). After suffering a loss caused by the fraud of a third party, Parkans submitted a claim under the crime coverage of the primary policy. Zurich denied coverage, and Parkans sued under both the primary policy and the CCP seeking coverage and damages. After a jury trial, the district court entered judgment for Parkans. For the following reasons, we reverse and render.

I. BACKGROUND AND PROCEDURAL HISTORY

Parkans agreed to purchase scrap metal from Adusa Export, promising payment with an irrevocable letter of credit to be issued by a bank of Parkans' choice and confirmed by a bank of Adusa's choice. Parkans chose Marine Midland which issued the letter of credit. Payment would occur at sight upon presentation of certain non-negotiable documents. Using fraudulent documents, Adusa obtained payment, despite never having shipped the scrap metal. Wells Fargo (the confirming bank) paid Adusa under the letter of credit, and Marine Midland withdrew funds from Parkans' account to pay Wells Fargo. Parkans, having sustained almost a million-dollar loss because of the fraud, notified its insurance broker, who said the loss was not covered. The perpetrators remain at large.

After filing a claim for indemnity under the primary policy, Parkans brought this action alleging that Zurich breached its contracts by failing to indemnify Parkans under both the primary policy and the CCP. Parkans also asked for tort damages against Zurich, alleging bad faith and violations of the Texas Insurance Code and Deceptive Trade Practices Act (DTPA). Zurich denied coverage under both policies and denied any wrongdoing.

Parkans moved for partial summary judgment on the primary policy, arguing that the crime coverage for forgery applied. Zurich moved for summary judgment on both policies and on the damage claims. The court granted Parkans' motion finding coverage under the primary policy and denied Zurich's motion.

2

The remaining issues went to trial by jury. After having been instructed that the loss was covered under the primary policy and that Zurich's failure to pay the claim was a breach of the primary policy, the jury found that Zurich failed to comply with the CCP. The jury also found that Zurich knowingly engaged in unfair and deceptive practices. The jury awarded $1.34 million for breach of contract, $1.29 million on the tort claims, and $350,000 for attorneys' fees at trial. The district court entered final judgment against Zurich only on the breach of contract award and attorneys' fees, awarding interest and statutory damages as well. Zurich appeals.

II.  PRIMARY COVERAGE AND THE PARKANS LOSS

The crime coverage at issue under the primary policy provides:

We will pay for loss involving Covered Instruments resulting directly from the Covered Causes of Loss.

1. **Covered Instruments**: Checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

   a. Made or drawn by or drawn upon [the insured];
   b. Made or drawn by one acting as [the insured's] agent;

   or that are purported to have been so made or drawn.

2. **Covered Causes Of Loss**: Forgery or alteration of, on or in a Covered Instrument.

Finding coverage under the foregoing provisions, the district court determined on summary judgment that Adusa obtained payment on the letter of credit by presenting "forged documents" to Wells Fargo, including forged certificates and a forged bill of lading.

3

This court reviews de novo the trial court's decision on summary judgment.  Mid-Continent Cas. Co. v. Chevron Pipeline Co., 205 F.3d 222, 225 (5th Cir. 2000).[1]

The summary judgment evidence establishes that the irrevocable letter of credit was payable at sight upon the presentation of certain documents, namely, a commercial invoice, a packing list, a certificate of weight, a quality and weight certificate from a qualified surveying firm, on board bills of lading issued to the order of Marine Midland by the shipper, and Adusa's signed statement certifying that one set of non-negotiable documents was sent by courier to Parkans immediately after shipment.  Adusa presented documents purporting to be those documents required by the letter of credit, most on its own letterhead, with an inspection quality and weight certificate ostensibly from Alfred H. Knight (a surveying firm) and bills of lading ostensibly from Crowley American Transport (a shipping company), although all the documents were fraudulent.

---

[1]  This Court will review a denied motion for summary judgment (as an exception to the general rule) if the district court granted the opposing party's summary judgment motion.  See, e.g., Ranger Ins. Co. v. Estate of Mijne, 991 F.2d 240, 241 (5th Cir. 1993).  In this case both Parkans and Zurich moved for summary judgment on the primary policy, though Parkans' motion was for partial summary judgment on that single issue and Zurich's was more extensive. Thus we will review the cross motions on coverage under the primary policy de novo, and review Zurich's remaining assignments of error on a post-trial basis.  Cf. Black v. J.I. Case Co., Inc., 22 F.3d 568, 570 n.3 (5th Cir. 1994) (no review of pretrial denial of summary judgment, with certain exceptions, if final adverse judgment follows full trial on the merits), cert. denied, 513 U.S. 1017, 115 S. Ct. 579, 130 L. Ed. 2d 494 (1994).

Zurich contends that even if forgeries occurred, they were not covered because they were not forgeries of "covered instruments." To be a "covered instrument," a document must be a check, draft, promissory note, or similar written promise, order or direction to pay "Made or drawn by or drawn upon [Parkans]; Made or drawn by one acting as [Parkans'] agent; or [] purported to have been so made or drawn." Even if we view the letter of credit as a "similar . . . promise[] to pay," it cannot be a "covered instrument" because it was neither made by, drawn by, or drawn upon Parkans or its agent, nor purported to have been so made or drawn.

The district court recognized that Parkans "may not have been the 'technical' drawee in the transaction," but treated Parkans as such simply because it was the party who "ultimately suffered the loss." The district court quoted from and embraced the reasoning of Omnisource v. CNA, 949 F. Supp. 681, 690 (N.D. Ind. 1996), which held Omnisource to be the "drawee" "[i]n the sense of 'to draw' as to withdraw, to call on funds, or to get from a source." Omnisource quoted from Black's Law Dictionary, American Heritage Dictionary and Webster's New Universal Unabridged Dictionary, in order to define "drawee".

A contextual analysis of the contract is the proper approach to determine the meaning of contractual terms. See Gulf Metals Indus., Inc. v. Chicago Ins. Co., 993 S.W.2d 800, 805-06 (Tex. App.-Austin 1999, pet. denied). The policy uses the term "drawn" in the context of the specific listed instruments and "similar

5

. . . promises, orders, or directions to pay." In the commercial paper context the phrases "drawn by" and "drawn upon" are not ambiguous and have a definite legal meaning. A contract term that can be given a definite or certain legal meaning is not ambiguous. National Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). We will not therefore interpose multiple dictionary usages.

The letter of credit itself identifies the drawee as the "Advising Bank," i.e., Marine Midland and not Parkans. Neither the letter of credit nor any of the fraudulent documents presented by Adusa were made or drawn by or drawn upon Parkans. Nor were any of those documents made or drawn by or drawn upon one acting as Parkans' agent. In the letter of credit transaction, Marine Midland acted as principal for itself not as agent for Parkans. See Republic Nat'l Bank v. Northwest Nat'l Bank, 578 S.W.2d 109, 114 (Tex. 1978). Finally, none of the documents were "purported to have been . . . made or drawn" by or drawn upon Parkans within the meaning of the policy. The remaining documents were all ostensibly made by Adusa or legitimate enterprises, not Parkans. Adusa's direction to Wells Fargo to pay via wire transfer, even if we consider it a forgery, was not drawn upon Parkans. Accordingly, none of the documents in this case are "covered instruments." We therefore reverse the partial summary judgment in favor of Parkans and render judgment for Zurich, finding no coverage under the primary policy.

6

III.  EXCESS COVERAGE UNDER THE CCP

Zurich moved for judgment as a matter of law that no coverage existed under the CCP.  We review denial of a motion for judgment as a matter of law using the same standard as the district court; factual issues are reviewed only for the presence of substantial evidence supporting the verdict, and legal issues are reviewed de novo.[2]  Heller Fin., Inc. v. Grammco Computer Sales, Inc., 71 F.3d 518, 523 (5th Cir. 1996).

The CCP applies "excess of, but in the same manner and on the same basis as the **primary insurance** shown on our Schedule A as applying to Coverage Part A-1."[3]  Even if the crime coverage in the primary policy is intended to be included in the meaning of the

---

[2]  We will not review the pretrial denial of Zurich's motion for summary judgment on this issue since final judgment was entered adverse to the movant on the basis of a subsequent full trial on the merits. See Ranger, 991 F.2d at 241 and n.1 above.

[3]  We disagree with Parkans' contention that the Texas Amendatory Endorsement replaces the quoted language in the CCP.  The quoted language is the first sentence of item A of Coverage Part A-1. The endorsement provides:
1.    The first sentence of Item A. of the Insuring Agreements of Coverage Part A-1 is replaced by the following:
2.    The first sentence of Item A. of the Insuring Agreements of Coverage Part B-1 is replaced by the following:
We will pay to the insured those sums the insured becomes legally obligated to pay or assumes under an insured contract that are in excess of the Retained Limit specified in the Declarations of our policy or any valid and collectible other insurance.
We interpret the blank after the first numbered paragraph of the foregoing endorsement as making no change to the first sentence of item A pertaining to Coverage Part A-1.

foregoing clause, the loss in this case is excluded because, as discussed above, the documents involved are not "covered instruments" as defined in the primary policy.

Parkans has alternatively argued that CCP provides a gap-filling function, and thus applies here regardless of underlying coverage. Parkans points to no provision in the CCP, however, specifying drop-down coverage if primary insurance does not apply. To the contrary, the CCP has a maintenance provision, requiring that "the primary insurance must continuously: provide no less coverage than written on our Schedule A at inception of our policy." Furthermore, if the primary coverages listed in Schedule A are not maintained, the CCP coverage "will apply in the same manner as if the primary insurance were still in effect, maintained and collectible." We hold that these provisions in the CCP preclude drop-down coverage by showing the intention that the CCP serve only as an excess layer above that insurance listed in Schedule A, none of which is applicable to the Parkans loss. Cf. Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1050, 1053 (5th Cir. 1993) (drop-down coverage implicated by clause providing a self-insured retention "for each occurrence not covered by the specified underlying [policy]").

IV. THE TORT CLAIMS

The jury also found that Zurich engaged in an unfair or deceptive act or practice that caused damage to Parkans, and did so

knowingly.[4]  Zurich had moved for judgment as a matter of law on those claims, so we review legal issues de novo and factual issues for substantial evidence in support of the verdict.  Heller Fin., 71 F.3d at 523.

On these claims Zurich is entitled to judgment as a matter of

---

[4]  The jury answered "yes" to the following question:
Did Zurich engage in any unfair or deceptive act or practice that caused damages to Parkans?
"Unfair or deceptive act or practice" means any of the following:
  Failing to affirm or deny coverage of a claim within a reasonable time, or
  Refusing to pay a claim without conducting a reasonable investigation of the claim, or
  Failing to provide promptly to Parkans a reasonable explanation of the factual and legal basis in the policy for an insurer's denial of the claim, or
  Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear, or
  Making or causing to be made any statement misrepresenting the terms, benefits, or advantages of an insurance policy, or
  making any misrepresentation relating to an insurance policy by:
    a.  failing to state a material fact that is necessary to make other statements not misleading, considering the circumstances under which the statements are made; or
    b.  making any statement in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact, or
  Representing that the Custom Cover Policy had or would have characteristics that it did not have, which representation Parkans relied on to its detriment, or
  Representing that an agreement confers or involves rights that it did not have or involve, which representation Parkans relied on to its detriment.
The jury also answered "yes" to the next question, whether Zurich engaged in the conduct "knowingly."  That question defined "knowingly" as having actual awareness at the time of the conduct "of the falsity, deception, or unfairness of the conduct in question."

law, because it had a reasonable basis for denial of coverage.  See Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Tex. 1994) (insured claiming bad faith must prove that insurer had no reasonable basis for denying or delaying payment of the claim). This shields Zurich whether the tort claims are common-law or statutory.  Id. (common-law breach of duty of good faith and fair dealing); Higginbotham v. State Farm Mut. Auto Ins. Co., 103 F.3d 456, 460 (5th Cir. 1997) (claims under DTPA and § 21.21 of the Texas Insurance Code require same predicate for recovery as a bad faith cause of action); see also Emmert v. Progressive County Mut. Ins. Co., 882 S.W.2d 32, 36 (Tex. App.—Tyler 1994, writ denied) (insurer will not be faced with a tort suit for challenging a claim of coverage if there was any reasonable basis for denying coverage) (violations of Texas Insurance Code, claims under Texas Deceptive Trade Practices Act, and common-law tort) (citing Lyons v. Millers Cas. Ins. Co., 866 S.W.2d 597 (Tex. 1993)).  Since there was a bona fide dispute justifying the insurer's failure to pay, the insurer, as a matter of law, did not act in bad faith.

Moreover, the jury essentially found no tort injuries independent of the contract damages.[5]  There can be no recovery for

_____

[5]  The verdict form contained the same line items of damages for the tort claims (question 5 on the verdict) as for the breach of contract claims (question 4), and the jury awarded less for each item on the tort question.  Even with the additional damages awarded for "knowing" misconduct (question 6), the total tort award was less.  Entering judgment the district court disregarded the tort damages ($1.29 million total awarded in questions 5 and 6 on the verdict) as included in the breach-of-contract award ($1.34

10

extra-contractual damages for mishandling claims unless the complained of actions or omissions caused injury independent of those that would have resulted from a wrongful denial of policy benefits. Provident American Ins. Co. v. Castaneda, 988 S.W.2d 189, 198-99 (Tex. 1998) (claims of Insurance Code violations and under DTPA).

V. OTHER ITEMS AWARDED PARKANS

Since plaintiff does not prevail under our ruling, no attorneys' fees or statutory damages are due. Tex. Ins. Code art. 21.55 § 6 (right to statutory damages and attorneys' fees predicated on insurer's liability on claim); Tex. Ins. Code art. 21.21 § 16(b) (right to attorneys' fees and other relief for plaintiff "who prevails"); Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 230 (Tex. 1990)(under the DTPA actual damage award is prerequisite to attorneys' fees); Tex. Civ. Prac. & Rem. Ann. § 38.001 (West 1997) (reasonable attorneys' fees recoverable "in addition to the amount of a valid claim").

VI. CONCLUSION

Because no covered instrument was made or drawn by or drawn upon Parkans, the crime coverage for forgery under the primary policy does not apply. Zurich not Parkans was entitled to summary judgment on coverage under the primary policy. The CCP provides only excess and not drop-down coverage, so it does not apply to

---

million total awarded question 4 of the verdict).

11

fill the gap in primary coverage.  There is no basis for recovery under the tort claims.  No attorneys' fees or statutory damages are due plaintiff.

The judgment previously entered in favor of Parkans is reversed, and judgment is rendered for Defendant Zurich Insurance Company denying all relief to Parkans.

REVERSED and RENDERED.

DENNIS, Circuit Judge, dissenting:

To the detriment of the insured, the majority gives the terms of this insurance policy their technical, rather than popular, meaning. Because this method of interpretation contravenes established canons of Texas insurance law, I respectfully dissent.

I.

The threshold question is whether Parkans's letter of credit is a "covered instrument." The policy defines covered instruments as:

> Checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:
>
>> 3. Made or drawn by or drawn upon [Parkans];
>> 4. Made or drawn by one acting as [Parkans's] agent;
>
> or that are purported to have been so made or drawn.

Because the policy provision refers to "checks," "drafts," and "promissory notes," the majority argues that the word "drawn" must be read in context according to its meaning under the UCC. It therefore concludes that the phrase "drawn by or drawn upon" limits coverage to transactions in which the insured is the actual "drawee" under Texas commercial paper law. Since Midland Bank was technically the drawee in this transaction, the court holds that the letter of credit was not "drawn upon" Parkans and therefore was not a covered instrument.

The majority's interpretation conflicts with basic principles of Texas insurance law. When interpreting an insurance contract,

13

Texas courts will read its terms in their plain, ordinary, and popular sense unless the policy defines a term in some other way.[6] Texas courts disfavor interpretations that limit coverage, and they construe ambiguities in favor of the insured.[7] Under these principles, Parkans was covered for its loss.

In the present context, the relevant popular definition of "draw" is "to withdraw" or "to take or receive money from a source of supply."[8] Under this plain-language reading, the letter of credit was "drawn upon" Parkans because the funds stolen in this

---

[6] Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984) ("[I]t is the court's duty to give the words used their plain meaning."); Ramsay v. Md. Amer. Gen. Ins. Co., 533 S.W.2d 344, 346 (Tex. 1976) ("With no definition in the policy, we must first determine whether the term has a readily ascertainable meaning in the plain, ordinary and popular sense of the words themselves."); see also 45 Tex. Jur. § 109, at 130-31 (3d ed. 1995) ("Contracts of insurance must be construed, as other contracts, according to the terms that the parties have used, to be taken and understood, in the absence of ambiguity, in their plain, ordinary, and popular sense, unless there are other provisions indicating a contrary intention of the parties. Thus, if the insurance policy does not define the terms used, they are to be given their plain, ordinary, and generally accepted meaning.").

[7] Puckett, 678 S.W.2d at 938 ("It is well established that insurance policies are strictly construed in favor of the insured in order to avoid exclusion of coverage."); Ramsay, 533 S.W.2d at 349 ("When the language of a policy is susceptible of more than one reasonable construction, the courts will apply the construction which favors the insured and permits recovery.").

[8] The American Heritage Dictionary 561 (3d ed. 1992) (defining "draw" as "To withdraw (money)."); Black's Law Dictionary 494-95 (7th ed. 1999) ("To take out (money) from a bank, treasury, or other depository."); IV Oxford English Dictionary 1026 (2d ed. 1989) ("To take, receive, or obtain (money, salary, revenue, etc.) from a source of supply.").

14

transaction were ultimately drawn from Parkans's account.[9]  And, to the extent that it is unclear whether the policy requires that Parkans be the technical drawee of the instrument, we are compelled to construe this ambiguity in favor of coverage.

The majority rejects this plain reading of the policy in favor of a more technical one.  Relying on <u>Gulf Metals Industries, Inc. v. Chicago Insurance Co.</u>,[10] the majority argues that the policy must be read in the commercial paper context and according to UCC definitions.  The majority's reliance on <u>Gulf Metals</u> is, however, misplaced.  At issue in <u>Gulf Metals</u> was the meaning of the phrase "sudden and accidental" as it appeared in an insurance policy.[11] The district court held that the term "sudden" adds a temporal element, meaning "abrupt" or "brief."[12]  The insured disagreed, arguing that "sudden" does not necessarily carry a temporal meaning.  Citing various dictionary definitions, the insured argued that the word can also mean "unexpected," and that this uncertainty of meaning proves that the policy is ambiguous.[13]

---

[9] <u>See</u> <u>Omnisource v. CNA/Transcontinental Ins. Co.</u>, 949 F.Supp. 681, 688-90 (N.D. Ind. 1996) (applying this plain-language construction of the phrase "drawn upon" and finding coverage for a similar loss under a similar policy).

[10] 993 S.W.3d 800 (Tex. App.–Austin 1999, pet. denied).

[11] <u>Id.</u> at 803.

[12] <u>Id.</u> at 805.

[13] <u>Id.</u>

15

The Texas appeals court rejected the insured's argument.[14] Noting that the word "sudden" appeared in conjunction with the word "accidental," the court reasoned that "sudden" must add a temporal requirement. "Because 'accidental' describes an unforeseen or unexpected event," the court held that "to ascribe the same meaning to 'sudden' would render the terms redundant and violate the rule that each word in a contract be given effect."[15] Thus, both of the proffered interpretations were ordinary, or popular; the court was not rejecting a plain-language interpretation in favor of a technical one. Rather, the court held that, in context, "sudden" was clearly being used in its popular temporal sense.

Contextual arguments like the one used in Gulf Metals are useful for interpreting terms that have multiple common meanings, but not for choosing a technical interpretation over a reasonable common interpretation. In this case, for instance, the phrase "drawn upon" cannot mean that the instrument must be "sketched" or "illustrated" upon Parkans's corporate headquarters, because the policy clearly uses the phrase in the context of monetary withdrawals. But there is nothing in the context of the policy that limits the word "drawn" to its technical meaning under the UCC. The term is not specifically defined, and the policy makes no reference to the Texas Business and Commerce Code. Under Texas

---

[14] Id. at 806.

[15] Id. at 805.

16

insurance law, if Zurich intended for the term to have a definition other than an ordinary one, it was required to define the term accordingly.[16]

Texas courts will sometimes interpret a term in an insurance policy according to its usage within a particular "vocation, trade, or industry."[17]   Reliance on trade usage is, however, only appropriate when the insured is acquainted with and has adopted the usage.[18]   For example, in Mescalero Energy, Inc. v. Underwriters Indemnity General Agency, Inc., a Texas appellate court applied the trade usage of the term "foundation" when interpreting a "Blowout

---

[16] See W. Reserve Life Ins. Co. v. Meadows, 261 S.W.2d 554, 557 (Tex. 1953) (stating that the terms of an insurance contract "are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows them to have been used in a technical or different sense"); 45 Tex. Jur. § 109, at 131 ("[I]f the insurance policy does not define the terms used, they are to be given their plain, ordinary, and generally accepted meaning.").

[17] Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc., 56 S.W.3d 313, 320 (Tex. App.–Houston [1st Dist.] 2001, pet. denied) (quoting Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 521 n.6 (Tex. 1995)).

[18] Emsco Screen Pipe Co. v. Heights Muffler Co., 420 S.W.2d 179, 182 (Tex. Civ. App.–Houston [14th Dist.] 1967, no writ) ("Usage or custom is admissible to determine the terms of a contract where parties have not defined them, provided such usage or custom is so well established and generally known as to raise a presumption that the parties knew of it and contracted with reference to it."); Trinity Universal Ins. Co. v. Rogers, 215 S.W.2d 349, 355-56 (Tex. Civ. App.–Dallas 1948, no writ) (stating that a party cannot be bound by a custom or usage unless the party knows of and has accepted the usage); see also 45 Tex. Jur. § 120, at 143-44 ("The general rule is that usage in a particular place, or of a particular class of persons, may not be binding on other persons unless they are acquainted with and adopt it.").

Insurance Policy."[19]  The insured in <u>Mescalero</u> was an oil and gas drilling contractor engaged in the practice of drilling horizontal wells.[20]  The policy was specifically designed to insure contractors against blowouts, which are common hazards associated with horizontal drilling.[21]  Thus, the insured was acquainted with the industry usage, and it was reasonable to assume that the parties intended to incorporate that usage into this industry-specific policy.

In contrast to <u>Mescalero</u>, there is no evidence in the present case that Parkans was familiar with commercial paper terminology or that the parties intended to incorporate UCC definitions.  Parkans recycles scrap metal; it does not provide banking or legal services.  There is no reason to assume that the company's officials were familiar with the technical terminology of commercial paper law.  Furthermore, Parkans's policy covers general commercial liability including bodily injuries, property damage, and other generic losses that most businesses incur; it is not specific to banking-related losses.  Thus, there is nothing in the record to suggest that the parties intended to incorporate a more specialized meaning.

In short, I would find coverage under the primary policy.

---

[19] 56 S.W.3d at 319.

[20] <u>Id.</u> at 315-16.

[21] <u>Id.</u>

Under a plain reading of the policy, the letter of credit was "drawn upon" Parkans in the sense that the money was ultimately drawn from Parkans's account. There is no valid contextual or trade usage argument for reading the policy in a specialized commercial-law sense.

## II.

Because I disagree with the majority's conclusion that there is no coverage under Parkans's primary policy, I also disagree with its conclusion that there is no coverage under the umbrella policy. The umbrella policy applies in "excess of, but in the same manner and on the same basis as the primary insurance listed in Schedule A . . . ." Schedule A lists Parkans's CGL policy as one of the primary policies covered by the umbrella policy. Thus, since the provisions at issue in this case fall under the CGL policy, Parkans was also covered under its umbrella policy.

## III.

For the foregoing reasons, I would affirm the district court's ruling. Under a proper, plain reading of Parkans's primary and umbrella policies, this loss was covered.