**GULF METALS INDUSTRIES, INC., Gulf Reduction Corporation, and Gulf Reduction Corporation as a Successor to Southern Zinc Company, Appellants,**

v.

**CHICAGO INSURANCE COMPANY, Interstate Fire & Casualty Company, Delta Lloyds Insurance Company, First State Insurance Company, Insurance Company of North America, Continental Casualty Company, Transcontinental Insurance Company, CNA Lloyds of Texas, Transportation Insurance Company, Fidelity & Casualty Insurance Company of New York and Glen Falls Insurance Company, Appellees.**

No. 03–98–00013–CV.

Court of Appeals of Texas, Austin.

May 13, 1999.

Michael G. Mullen, Brown McCarroll & Oaks Hartline, Austin, for Appellants.

Mark L. Nissenbaum, Nissenbau Long & Levit, San Francisco, Christopher W. Martin, Bracewell & Patterson, L.L.P., Thomas L. Cougill, Funderburk & Funderburk, L.L.P., Houston, Scott R. Hoyt, Gibson, Dunn & Crutcher, L.L.P., Dallas, for Appellees.

Before Justices JONES, B.A. SMITH and YEAKEL.

LEE YEAKEL, Justice.

Appellants Gulf Metals Industries, Inc., Gulf Reduction Corporation, and Gulf Reduction Corporation as a successor to Southern Zinc Company[1] appeal the district court's grant of summary judgment in favor of appellees, all of whom at one time or another issued policies of insurance to Gulf Metals.[2] Gulf Metals claims that the district court erred in ruling that, as a matter of law, the qualified polluter's exclusion clause contained in the policies of insurance issued by CIC to Gulf Metals is

unambiguous and thus precludes coverage for environmental cleanup costs resulting from Gulf Metals' sale of zinc materials. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The background facts are essentially undisputed. Gulf Metals, a Houston-based corporation, has been in the business of buying, selling, recycling, and processing scrap metals since 1951. From approximately 1977 until 1988, Southern Zinc sold zinc materials and by-products to Gulf Metals Industries. During this same period, both Southern Zinc and Gulf Metals Industries sold zinc materials and by-products to the Stoller Chemical Company, located in South Carolina, where Stoller manufactured and sold agricultural fertilizer supplements. In 1995, Gulf Reduction Corporation merged with Southern Zinc and absorbed Southern Zinc's assets and liabilities.

It does not appear from the record that Gulf Metals Industries, Gulf Reduction Corporation, or Southern Zinc knew, or had any reason to know, that Stoller's fertilizer-manufacturing operations would have serious adverse effects on the environment. Throughout the time of the sales, fertilizer-manufacturing operations involving zinc were not thought to have serious environmental ramifications to neighboring property and groundwater. However, the soil and groundwater at the

1. Gulf Metals Industries, Inc. and Gulf Reduction Corporation are affiliated corporations; we will use their own designation, "Gulf Metals," when we refer jointly to both entities.

2. Gulf Metals' third amended petition named twenty insurance companies, including Chicago Insurance Company, as defendants in this lawsuit. The district court's final judgment granted motions for summary judgment on behalf of numerous defendant insurance companies by name and generally denied all other relief, thus disposing of Gulf Metals' claims against any other insurers. Appellees in this Court were originally Chicago Insurance Company, Interstate Fire & Casualty Company, Delta Lloyds Insurance Company of Texas, First State Insurance Company, Insurance Company of North America, Continental Casualty Company, Transcontinental Insurance Company, CNA Lloyds of Texas, Transportation Insurance Company, Fidelity & Casualty Insurance Company of New York and Glen Falls Insurance Company. Chicago Insurance Company and Interstate Fire & Casualty Company settled with Gulf Metals after this appeal was filed and were subsequently dismissed from the suit. However, the style of the case remains *Gulf Metals Industries, Inc., et al. v. Chicago Insurance Company, et al.* For convenience and clarity we refer to the insurance company defendants, including those remaining as appellees, collectively as "CIC."

Stoller Site were later found to be contaminated. In 1994, the United States Environmental Protection Agency (the "EPA") issued an administrative order requiring Gulf Metals to participate in the cleanup of the Stoller Site and reimburse the EPA for existing cleanup costs. South Carolina's state environmental agency issued a similar order to Gulf Metals in 1997.

Since 1958, Gulf Metals has purchased comprehensive general liability insurance policies from numerous insurance companies including appellees. These policies provide, in relevant part, that the insurer will pay "all sums which the insured shall become legally liable to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence...." The policies define "occurrence" as: "an accident, including injurious exposure to conditions, which results in bodily injury or property damage during the policy period neither expected nor intended from the standpoint of the insured." In 1970, the liability insurance policies added the qualified polluter's exclusion, which provides:

> This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Emphasis added). Thus, this added provision provides that damage caused by contaminants or pollutants is excluded from policy coverage unless their introduction is "sudden and accidental." In such event, the damage comes within policy coverage as an exception to the exclusion.

All of the liability insurance policies sold to Gulf Metals after it started doing business with Stoller in 1977 exclude coverage for damage caused by contaminants or pollutants, but all also contain the "sudden and accidental" pollution exception. However, none of the policies at issue defines the phrase "sudden and accidental."

Gulf Metals brought suit against CIC, seeking a declaration that the qualified polluter's exclusion did not bar coverage for the environmental claims arising at the Stoller Site. Gulf Metals focused on the exception and argued that the word "sudden" can reasonably be interpreted to mean "unexpected," so that the "sudden and accidental" exception to the pollution exclusion would reinstate coverage as long as the underlying event was unexpected and unintended from the standpoint of the insured. CIC moved for summary judgment, responding that "sudden" necessarily contains a temporal element requiring that any discharge of pollutants be swift or abrupt for the exception to the exclusion to apply. CIC claimed an affirmative defense that no coverage existed because, under its interpretation, the zinc leakage at the Stoller Site was not "sudden" in time. Gulf Metals also sought partial summary judgment that the "sudden and accidental" exception did not constitute a valid affirmative defense for CIC.[3]

The district court's final judgment incorporated earlier orders of the court ruling that Gulf Metals had the burden of proving that the "sudden and accidental" exception did not bar coverage, and declaring: 1) that there was neither patent nor latent ambiguity in the phrase "sudden and accidental"; 2) that the term "sudden," as used in the policy, contains a temporal element; and 3) that the phrase "sudden and accidental" means "rapid and unexpected." The court granted summary judgment to CIC on the basis that Gulf

---

3. Gulf Metals and CIC stipulate that Gulf Metals is unable to show that a rapid discharge, dispersal, release or escape of contaminants or pollutants from their intended place or

places of containment at the Stoller Site was responsible for any or all of the pollution or pollution-related damage.

Metals could not meet its burden of proving that the exclusion did not bar coverage. The district court also denied Gulf Metals' motion for partial summary judgment.

## DISCUSSION

The standards for reviewing a motion for summary judgment are well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *See Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). The function of summary judgment is not to deprive litigants of the right to trial by jury, but to eliminate patently unmeritorious claims and defenses. *See Swilley v. Hughes,* 488 S.W.2d 64, 68 (Tex.1972).

Insurance policies are contracts, and their construction is governed by the same rules of construction applicable to all contracts. *See Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 740–41 (Tex.1998); *National Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex.1995). In construing an insurance contract, its terms are given their "ordinary and generally accepted meaning." *Security Mut. Cas. Co. v. Johnson,* 584 S.W.2d 703, 704 (Tex. 1979). The primary goal of the court "is to give effect to the *written expression of the parties' intent.*" *Balandran,* 972 S.W.2d at 741 (emphasis added) (quoting *State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995) and *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994)). In construing a written con-

tract, a court should "ascertain the intent of the parties *as expressed in the instrument.*" *National Union,* 907 S.W.2d at 520 (emphasis added) (citing *Forbau,* 876 S.W.2d at 133). "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *National Union,* 907 S.W.2d at 520; *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). However, if "the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *National Union,* 907 S.W.2d at 520; *see also Balandran,* 972 S.W.2d at 741. "Where an ambiguity involves an exclusionary provision of an insurance policy, [courts] must adopt the construction ... urged by the insured as long as the construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Balandran,* 972 S.W.2d at 741 (quoting *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991)).

An ambiguity in a contract generally will fall into one of two categories: "patent" or "latent." "A patent ambiguity is evident on the face of the contract." *National Union,* 907 S.W.2d at 520. "A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." [4] *Id.*

By its first three issues, Gulf Metals asserts that the district court erred in not considering evidence of the circumstances surrounding the promulgation of the qualified polluter's exclusion provision of the insurance policies at issue. This evidence, urges Gulf Metals, shows that the intention of the drafters of the clause was that the exclusion only bar coverage for intentional pollution and there are no material facts showing that the pollution at and

---

4. The district court used this example from *National Union:* "[I]f a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two

green houses on the street, it would be latently ambiguous." *National Union,* 907 S.W.2d at 520 n. 4.

around the Stoller Site was expected or intended by Gulf Metals. Gulf Metals suggests that the policy terms are "possibly ambiguous," and the evidence that the district court failed to consider would aid in the interpretation of the exception asserted by Gulf Metals, that the discharge of pollutants need not be rapid to trigger coverage in Gulf Metals' favor. We concur that there is no evidence that the pollution was either expected or intended by Gulf Metals. Thus, our inquiry is whether the construction advanced by Gulf Metals of the phrase "sudden and accidental" as used in the qualified polluter's exclusion clause is a reasonable interpretation. *See Hudson Energy Co.*, 811 S.W.2d at 555 (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex.1987)).

### The Qualified Polluter's Exclusion Clause is not Patently Ambiguous

■ The district court correctly held that "sudden and accidental" is not patently ambiguous. In so doing, the court relied on *Mustang Tractor & Equipment Co. v. Liberty Mutual Insurance Co.*, 76 F.3d 89 (5th Cir.1996). *Mustang Tractor* applied Texas law in interpreting the pollution-exclusion clause of a general liability policy almost identical to the clause here. The *Mustang Tractor* court, after applying Texas rules of contractual construction, reached an opposite conclusion to that urged by Gulf Metals when analyzing "sudden" as joined with "accidental" to form the phrase "sudden and accidental." The court reasoned that the use of both words *together* reflected two *separate* requirements. Because "accidental" describes an unforeseen or unexpected event, to ascribe the same meaning to "sudden" would render the terms redundant and violate the rule that each word in a contract be given effect. The court stated that "sudden" therefore must contain a temporal element meaning abrupt or brief.

Because Texas courts agree that "accidental" generally describes an unforeseen or unexpected event, *see e.g., Republic Nat'l. Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 554 (Tex.1976), giving "sudden" the same meaning would violate the requirement that we give each word effect. As one court has stated: "The very use of the words 'sudden and accidental' ... reveal a clear intent to define the words differently, stating two separate requirements. Reading 'sudden' in its context, i.e., joined by the word 'and' to the word 'accident,' the inescapable conclusion is that 'sudden,' even if including the concept of unexpectedness, also adds and [sic] additional element because 'unexpectedness' is already expressed by 'accident.' This additional element is the temporal meaning of sudden, i.e., abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage."

*Mustang Tractor*, 76 F.3d at 92 (quoting *Northern Ins. Co. v. Aardvark Assoc., Inc.*, 942 F.2d 189, 192–93 (3d Cir.1991)); [5] *see also SnyderGeneral Corp. v. Century Indem. Co.*, 907 F.Supp. 991, 997 (N.D.Tex. 1995), *aff'd in part and vacated in part*, 113 F.3d 536 (5th Cir.1997).

■ In its analysis, the *Mustang Tractor* court concluded that the *context* in which a word is used must control its definition. *See Mustang Tractor*, 76 F.3d at 92. We find *Mustang Tractor's* analysis persuasive and agree that contextual inquiry is the approach to follow here. Gulf Metals urges that a review of dictionaries reveals that definitions of the word "sudden" often emphasize that the word contains an "unexpected" or "unforeseeable" element.[6] While dictionaries may be help-

[5]. *Aardvark Associates*, while construing "sudden and accidental," did so in the context of Pennsylvania state law.

[6]. "[H]appening, coming, made, or done quickly, without warning, or unexpectedly; a sudden attack." *Random House Dictionary of the English Language* 1900 (Stuart B. Flexner ed., 1987); "Happening without previous no-

ful to the extent they set forth the ordinary, usual meaning of words, they provide an inadequate test for ambiguity. To allow the existence of more than one dictionary definition to be the *sine qua non* of ambiguity would eliminate contextual analysis of contractual terms; any time a definition appeared in a dictionary of whatever credibility or usage, that definition could be said to be "reasonable" and thus render many, if not most, words ambiguous. Dictionaries define words in the abstract, while courts must determine the meaning of terms in a particular context, here a specific insurance policy. Dictionary definitions alone can therefore be accorded little weight in determining ambiguity. The fact that different people reading different dictionary definitions of the same word might reach different interpretations of that word does not make each reading and interpretation reasonable. We agree with those courts holding that such definitions provide no significant help in determining whether a term has two reasonable meanings. *See New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1193–94 (3rd Cir.1991); *Cyprus Plateau Mining Corp. v. Commonwealth Ins. Co.*, 972 F.Supp. 1379, 1384–85 (D.Utah 1997); *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litigation*, 870 F.Supp. 1293, 1348 (E.D.Pa.1992), *aff'd on other grounds*, 15 F.3d 1249 (3rd Cir.), *cert. denied*, 513 U.S. 915, 115 S.Ct. 291, 130 L.Ed.2d 206 (1994).

*Mustang Tractor* did not employ a multiple-dictionary-definition test to determine whether "sudden" was ambiguous. The court placed "sudden" in its correct contextual position as part of the term "sudden and accidental," applied Texas rules of

construction, and concluded that " '[s]udden' may only reasonably be construed to mean quick or brief." *Mustang Tractor*, 76 F.3d at 92–93; *see also Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 194 (5th Cir.1998); *Texas E. Transmission*, 870 F.Supp. at 1350 ("[A] definition of 'sudden' which divorces it from the meaning of 'swift' and 'abrupt' is an unreasonable and tortured interpretation and not one which the Supreme Court of Texas is likely to adopt.").

Until recently, no Texas state court had examined the qualified polluter's exclusion. In *Mesa Operating Co. v. California Union Insurance Co.*, 986 S.W.2d 749, 755 (Tex.App.—Dallas 1999, no pet. h.), the Fifth Court of Appeals, relying on *Mustang Tractor* and *SnyderGeneral*, applied a contextual analysis to the same clause that we consider here, and found that "common usage of the term 'sudden' includes a temporal element." *Mesa Operating*, at 755. We agree. Without resort to a reference work, it is difficult to think of a situation where, in a normal, common or ordinary interchange, a person would use "sudden" without intending to impart a sense of immediacy.

Gulf Metals directs us to a number of judicial decisions supporting its interpretation of "sudden" as meaning merely "unexpected," and thereby imparting no temporal element. Indeed a substantial number of courts nationwide have examined the construction of "sudden," but without reaching a consensus.[7] Gulf Metals proffers that this split in authority regarding the meaning of "sudden" suggests that the term is ambiguous, thereby

tice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for." *Black's Law Dictionary* 1432 (6th ed.1990); "[H]appening or coming unexpectedly." *Webster's Ninth New Collegiate Dictionary* 1178 (Frederick C. Mish ed., 1988).

**7.** Many of these cases are gathered in *New Castle County v. Hartford Accident & Indemnity Co.*, 933 F.2d 1162, 1195–96 n. 60–61 (3rd Cir.1991). The *New Castle County* court

found these cases almost evenly divided, with about half holding that a similar pollution exclusion clause barred coverage, and the remainder holding that it did not. The court could "discern neither a noticeable trend nor a majority position." *New Castle County*, 933 F.2d at 1195. Gulf Metals notes that this division has remained basically unchanged since the *New Castle County* decision.

rendering its construction of the qualified polluter's exclusion clause reasonable. We disagree. The presence of conflicting judicial decisions is insufficient to create an ambiguity as a matter of law. *See Mesa Operating,* at 756–57 (citing *Union Pac. Resources Co. v. Aetna Cas. & Sur. Co.,* 894 S.W.2d 401, 405 (Tex.App.—Fort Worth 1994, writ denied)). To hold otherwise would unduly restrict the ability of courts to engage in meaningful contextual analyses of contract terms. Courts would no longer be free to reach their own conclusions regarding contract interpretation once other courts had developed differing interpretations. *See T.C. Bateson Const. Co. v. Lumbermens Mut. Cas. Co.,* 784 S.W.2d 692, 698 (Tex.App.—Houston [14th Dist.] 1989, writ denied).

We hold that in the context of the comprehensive general liability policies under examination in this case, the word "sudden" clearly and unambiguously imparts a sense of temporal urgency, and is therefore not patently ambiguous.

## The Circumstances Surrounding the Promulgation of the Policy Language Cannot be used to Create an Ambiguity

■ The lack of facial ambiguity in the insurance contracts before us does not end our inquiry, because an ambiguity may appear by reason of a collateral matter. *See National Union,* 907 S.W.2d at 520. Gulf Metals asserts that prior to the inclusion of the qualified polluter's exclusion clause in liability insurance policies, these policies clearly covered the gradual release of contamination such as the release here. The insertion of the clause, according to Gulf Metals, was not meant to change any existing coverage. CIC contends that the

Texas State Board of Insurance,[8] in approving the change in policy language, intended that claims for gradual pollution not be covered, and that the purpose of the new exclusion was to ensure that occurrence-based policies would not be construed by the courts to extend coverage to such claims.

Gulf Metals argues that the supreme court's recent opinion in *Balandran*[9] allows consideration of circumstances surrounding the *promulgation* of an insurance policy form when determining the existence of an ambiguity. The district court, without the benefit of *Balandran,*[10] correctly found that a difference in interpretation does not create a latent ambiguity that would allow the introduction or discovery of evidence regarding the insurance industry's understanding of the meaning of the clause at the time it was drafted.

*Balandran* must be read in conjunction with *National Union.*[11] *National Union* involved the issue of the breadth of "absolute pollution exclusions," namely provisions found in certain policies of insurance that deny coverage for any damage caused by pollutants regardless of why, how or when the pollutants were released. The procedural facts of *National Union* are similar to those before us. When its insurers denied coverage for a pollution claim, an insured brought suit against them. The insurers moved for summary judgment on the basis that the "absolute pollution exclusions" in their polices precluded coverage as a matter of law; the insured responded that the policies, by virtue of these exclusions, contained both patent and latent ambiguities. The trial court

---

8. Now the Texas Department of Insurance. *See* Tex. Ins.Code Ann. art. 1.01A(c) (West Supp.1999). The change in title designation did not affect any actions taken by the State Board of Insurance. *See* Act of June 6, 1991, 72d Leg., ch. 242, art. 13, § 13.01, 1991 Tex. Gen. Laws 939, 1133.

9. *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738 (Tex.1998).

10. The district court rendered an order entitled "Order Interpreting 'Sudden and Accidental' as used in the Subject Insurance Policies" on September 10, 1997, and incorporated this order by reference in his "Final Judgment" rendered January 7, 1998. *Balandran* was decided July 3, 1998.

11. *National Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517 (Tex.1995).

granted the insurance companies' motions for summary judgment before the insured had the opportunity to obtain any documents through discovery even though the trial court did have before it certain insurance industry documents relating to testimony before the State Board of Insurance. *National Union*, 907 S.W.2d at 519. The court of appeals reversed the trial court's grant of summary judgment in favor of the insurers, holding that the trial court abused its discretion when it rendered summary judgment before allowing discovery. *Id.* at 520. The discovery sought by the insured was evidence that its insurers knew and approved of industry-wide discussions concerning the breadth of the "absolute pollution exclusion" and understood that the provision would *not* exclude coverage in certain situations. *Id.* at 520–21. The supreme court reversed the court of appeals and affirmed the trial court.

■ In relating the rules of construction applicable to a policy or contract, the supreme court in *National Union* was careful to restrict when "surrounding circumstances" outside the four corners of the policy could be considered. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole *in light of the circumstances present when the contract was entered.*" *Id.* at 520 (emphasis added) (citing *Coker*, 650 S.W.2d at 394 and *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980)). However, the parties' *interpretation* of a contract can be considered only *after* the court has found the contract to be ambiguous. *Id.* The supreme court held that the evidence sought to be discovered was germane only to the parties' interpretation of the "absolute pollution exclusion." In reversing the court of appeals, the supreme court found that the discovery allowed by the court of appeals gave the insured the "opportunity to discover parol evidence going to the parties' intentions in order to create a latent ambiguity." *National Un-*

*ion*, 907 S.W.2d at 521. The supreme court refused to allow such discovery.

■ It is apparent that the "surrounding circumstances" that may be considered in determining ambiguity are those surrounding the *making* of the contract, not those present when a regulatory body promulgates the *form* of the contract:

> The ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity. Neither the court of appeals' opinion nor the parties' briefs have raised any need for additional facts to apply the insurance policies to the subject matter with which they deal. The facts relating to the accident, the release of hydrofluoric acid as a result of that accident, and the personal injury and property damage claims allegedly resulting from that release appear to be fully developed. The surrounding circumstances present when the contract was entered into were amply established for the purpose of determining whether an ambiguity exists in this case on these facts.

*Id.* at 521.

■ In the case before us, the facts relating to the release of pollutants into the soil and groundwater at the Stoller Site and the alleged damage resulting from that release are likewise fully developed. Nothing further is needed to determine whether the qualified polluter's exclusion clause is ambiguous. No issue of the parties' intentions is present unless the policy is first ambiguous. *Id.* at 521 n. 5.

Gulf Metals misconstrues the breadth of *Balandran*. *Balandran* dealt with contradictory language *found within the policy itself. See Balandran*, 972 S.W.2d at 742 n. 3. The Balandrans' home was insured pursuant to a contract of insurance contained in a policy form promulgated by the State Board of Insurance. When their home suffered damage due to an underground plumbing leak, the Balan-

drans filed a claim with their insurer. Their policy provided two types of coverage. Coverage A insured the dwelling itself, while Coverage B insured personal property. Coverage A provided protection for all risks of physical loss unless specifically excluded in the exclusion section of the coverage. The insurer asserted one such exclusion, which the Balandrans conceded would cover their loss if the exclusion applied. However, they argued that language in Coverage B (the personal property section of the policy) created an exception to the exclusion claimed by their insurer. The insurer argued that because the exception only appeared in Coverage B, it applied only to personal property. The Balandrans contended that because the exception made specific reference to the exclusion claimed by their insurer, it applied to any loss, not just a personal-property loss. The supreme court discussed the general rules of contract interpretation applicable to insurance policies and stated, "[a]pplying these rules, we conclude that the exclusion repeal provision is subject to two reasonable interpretations, and is therefore ambiguous." *See id.* at 741.

Only *after* determining that the exclusion repeal provision was patently ambiguous did the court turn to a consideration of the circumstances *surrounding the promulgation of the policy form. See id.* The court concluded that these circumstances enforced the reasonableness of the Balandrans' interpretation of the ambiguous language found in the policy. *See id.* The court specifically stated that the circumstances surrounding the promulgation of the policy form were not considered in determining *the existence* of an ambiguity, but "[b]ecause the Balandrans' interpretation of the *contract language* is reasonable, an ambiguity *exists on the face of the policy." Id.* at 742 n. 3 (emphasis added).[12]

Not every differing interpretation of an insurance policy creates an ambiguity. Indeed, as observed by the supreme court, "Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994) (emphasis in original).

We hold as a matter of law that "sudden and accidental" clearly and unambiguously imparts a sense of temporal urgency requiring the release of pollutants to be swift, rapid, or abrupt to trigger the exception to the qualified polluter's exclusion clause and afford Gulf Metals coverage under the policies under consideration here. No ambiguity exists on the face of the policies issued by CIC to Gulf Metals, and evidence of the circumstances surrounding the promulgation of the form of those policies may not be considered to create a latent ambiguity. We therefore overrule Gulf Metals first three issues.[13]

## CONCLUSION

The district court was correct in holding that the qualified polluter's exclusion bars coverage for Gulf Metals' damage claims as a matter of law. We affirm the judgment of the district court.

**12.** The dissent likewise misconstrues the breadth of *Balandran* and implies that *Balandran* has overturned *National Union's* holding that ambiguity must be determined before parol evidence of intent is considered. *See Gulf Metals Indus., Inc. v. Chicago Ins. Co.,* 993 S.W.2d 800, 802 n. 2 (Tex.App.—Austin 1999, no pet. h.) (Smith, J., dissenting). We disagree and believe that *National Union* and *Balandran* are to be read in harmony.

**13.** In its final issue Gulf Metals argues that the district court improperly assigned to it the burden of proving the exception to the qualified polluter's exclusion. Because we uphold the district court's grant of summary judgment in favor of CIC, which held as a matter of law that the qualified polluter's exclusion is unambiguous, we do not address this issue.

BEA ANN SMITH, Justice, dissenting.

I agree that the majority's interpretation of the phrase "sudden and accidental" in the qualified pollution exclusion is eminently reasonable, perhaps more reasonable than the insured's definition. Indeed, I would have joined the majority had this opinion been handed down before the supreme court issued its decision in *Balandran v. Safeco Insurance Co. of America*, 972 S.W.2d 738 (Tex.1998). Because I find that *Balandran* compels a finding that the insured's reading of "sudden and accidental" is *also* reasonable, I would hold that the trial court erred in granting summary judgment in favor of CIC.[1] I respectfully dissent.

### Significance of Balandran

*Balandran* involved a simple issue: whether a standard homeowner's policy covered damage to a foundation caused by an underground plumbing leak. One year earlier, the Fifth Circuit had addressed the identical question and held that under its reading of Texas law the policy provision *unambiguously* excluded damage to a foundation caused by a plumbing leak. *See Sharp v. State Farm Fire & Cas. Ins. Co.*, 115 F.3d 1258 (5th Cir.1997). The court held that the insured's interpretation was not reasonable; therefore, the exclusion was unambiguous, and the insured was not entitled to the benefit of the ambiguity. *See id.* at 1262–63.

In *Balandran* the supreme court examined the same provision and reached a different result, essentially holding that the Fifth Circuit misapplied Texas law in *Sharp*. Furthermore, the court gave a generous reading of what can be considered a "reasonable interpretation" of a coverage exclusion by an insured. Courts "must adopt the construction . . . urged by the insured as long as that construction is not unreasonable, *even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.*" *Balandran*, 972

S.W.2d at 741 (quoting *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.1991) (emphasis added)). The policy at issue in *Balandran* excluded water damage to the dwelling; the insureds conceded that the damage to their foundation fell under this exclusion unless language in the *personal property* section created an exception to the exclusion when the structural damage resulted from a plumbing leak. The exclusion repeal that the insureds relied on covered *personal property* against accidental discharge or leakage or overflow of water or steam from within a plumbing system. This part of the policy further provided that "Exclusions 1.a through 1.h under Section I Exclusions do not apply to loss caused by this peril." Exclusion 1.h excluded structural damage resulting from a plumbing leak. The Balandrans did not suffer any personal property loss, but relied on this sentence to argue that exclusion 1.h did not apply to the loss damage to their home caused by a plumbing leak. The insurer insisted, relying on the Fifth Circuit's earlier opinion in *Sharp*, that an exception found in the personal property coverage section of the policy could not be used to avoid the exclusion found in the dwelling coverage section. In that case, the circuit court had concluded:

> We are sympathetic to the Sharps' situation, but we cannot agree that text specifically included in Coverage B, which applies only to personal property, may be imported into Coverage A, which applies to the dwelling or house, in order to create coverage for a loss that does not involve personal property damage. The Sharps' policy clearly and unambiguously divides dwelling losses and personal property losses into two separate 'coverages.' It therefore would appear to be nonsensical, and a rejection of the obvious structure of the policy, to reach into text that applies solely to [personal

---

1. Because *Balandran* had not been decided at the time of the summary judgment hearing, the trial court did not have the benefit of the supreme court's most recent analysis.

property losses] to determine the extent of coverage under [the dwelling section]. *Sharp,* 115 F.3d at 1262.

To find the insured's interpretation "reasonable" and the policy provision ambiguous, the supreme court in *Balandran* applied standard rules of contract construction: (1) insurance contracts are subject to the same rules of construction as other contracts, (2) the primary goal is to give effect to the written expression of the parties intent, and (3) the court will strive to give meaning to every sentence, clause and word to avoid rendering any portion inoperative. *See Balandran,* 972 S.W.2d at 741. The court went on to add: "While parol evidence of the parties' intent is not admissible to create an ambiguity, *the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists." Id.* (emphasis added, citations omitted). Furthermore, the court thought it proper to consider the circumstances surrounding the promulgation of the policy form in determining whether the Balandrans' interpretation was reasonable. Noting that insurers must use forms adopted by the State Board of Insurance, that an earlier version of the form contained exclusion-repeal language that unquestionably applied to dwelling coverage as well as personal property loss, and that the revision of the form was intended to simplify the policy language and not to restrict any coverage previously available, the court concluded that "the Balandrans' interpretation becomes even more reasonable when we consider the circumstances surrounding the promulgation of this policy form." *Id.*

*Balandran* recognizes that insurance is a regulated industry and that the regulatory entity that promulgates mandatory policy forms is a silent party to a contract that *must* be written on such forms. The surrounding circumstance evidence that the supreme court reviewed in *Balandran* went to the intent of this silent party in promulgating the form. While parol evidence of what an *individual insured* and an *individual insurer* intended is not admissible to create an ambiguity, *Balandran* held that evidence of what the Department of Insurance intended in revising the policy form could be considered in determining whether either party's interpretation of the policy was reasonable.

Gulf Metals asked the trial court to consider similar circumstances surrounding the promulgation of the form at issue in this dispute. Gulf Metals argues that prior to the inclusion of the qualified polluter's exclusion clause in liability insurance policies, these policies clearly covered the gradual but unintentional release of contamination. It sought to discover and have the court consider historical drafting and regulatory evidence concerning the adoption of the pollution exclusion clause at issue. Gulf Metals argued that the circumstances surrounding the promulgation of the pollution exclusion clause would reveal that the "sudden and accidental" language was not meant to restrict then-existing coverage of unintentional pollution. CIC responded that the State Board of Insurance, now the Department of Insurance, intended to ensure that occurrence-based policies would *not* be construed to cover claims such as those presented here. Without the benefit of *Balandran,* the trial court followed the mistaken view of the Fifth Circuit in *Mustang Tractor & Equipment Co. v. Liberty Mutual Insurance Co.,* 76 F.3d 89 (5th Cir.1996), and refused to consider surrounding circumstance evidence regarding the promulgation of the "sudden and accidental" exception to the pollution exclusion to determine whether the insured's interpretation was reasonable. Under *Balandran,* such evidence is admissible to determine ambiguity, which exists when both parties' interpretations are reasonable. I would hold that the trial court in the present case erred in granting summary judgment without considering this evidence of surrounding circumstances.

The majority points to footnote three as justification for ignoring this significant rule of construction set forth in *Balandran*, and instead reaches back to the earlier language in *National Union Fire Insurance Co. v. CBI Industries, Inc.*, 907 S.W.2d 517 (Tex.1995), stating that the parties' interpretation of a contract can be considered only after the court has found the contract to be ambiguous. Indeed, *Balandran* agrees that parol evidence of the parties' intent cannot be considered unless the policy is first found to be ambiguous. *See Balandran*, 972 S.W.2d at 741. However, *Balandran* specifically holds that surrounding circumstance evidence regarding promulgation of the policy form is not "extrinsic evidence" and may be considered in *determining* whether a party's interpretation of the policy is reasonable. As the dissent in *Balandran* points out, this rule is at odds with the Fifth Circuit's holding in *Sharp* that the insured "may not point to the revision process to create an ambiguity." *See Balandran*, 972 S.W.2d at 745 (Owen, J., dissenting) (quoting *Sharp*, 115 F.3d at 1262). In the present case, the majority follows the view expressed by Justice Owen in the *Balandran* dissent and by the Fifth Circuit in *Sharp*, that evidence of what the former policy form stated and the intent of those who revised its language is extrinsic evidence that may not be considered until the court determines that an ambiguity exists on the face of the policy. The apparent contradiction between footnote three and the holding that "the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists," 972 S.W.2d at 741, can be harmonized if we consider the regulated nature of insurance contracts. Can Gulf Metals rely on representations allegedly made by the insurance industry to the Department that the language "sudden and accidental" in the revised form would not restrict exist-

ing coverage of unintentional pollution? I think *Balandran* holds that it may.[2] We don't know whether the surrounding circumstance evidence here will make Gulf Metals' interpretation of this pollution exclusion clause more reasonable or not because the trial court refused to consider it. I would reverse the summary judgment and remand for the trial court to read the present contract in light of such evidence.

### *"Sudden" Can Reasonably be Interpreted To Mean "Unexpected"*

I disagree with the majority's claim that dictionaries "provide no significant help in determining whether a term has two reasonable meanings." It is true that courts must determine the meaning of words in a particular context; I also agree that dictionaries *alone* provide an inadequate test for ambiguity. However, dictionary definitions may provide guidance when the context does not. Nothing about the phrase "sudden and accidental" *requires* "sudden" to contain a temporal element. The context in which the phrase is used simply does not mandate such a construction.

When the majority asserts that "sudden" is never used in ordinary conversation without a temporal aspect, what it is really saying is that "sudden" can *never* mean only "unexpected." This notion is not supported by any dictionary usage, caselaw, or any other authority. I believe that it is reasonable to read "sudden" to mean "unexpected." As the Georgia Supreme Court observed:

> [E]ven in its popular usage, "sudden" does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring.

**2.** In this regard I think the majority got it backwards when it held that "the 'surrounding circumstances' that may be considered in determining ambiguity are those surrounding the *making* of the contract, not those present when a regulatory body promulgates the *form* of the contract."

*Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686, 688 (1989). Accordingly, leading dictionaries provide "unexpected" or "without previous notice" as *primary* definitions of "sudden." [3]

In arriving at the conclusion that "sudden and accidental" cannot mean "unexpected and unintended," the majority relies on the Fifth Circuit's opinion in *Mustang Tractor & Equipment Co. v. Liberty Mutual Insurance Co.*, 76 F.3d 89 (5th Cir.1996). As the majority observes, the *Mustang Tractor* court stated that "Texas courts agree that 'accidental' generally describes an unforeseen or unexpected event...." *Id.* at 92. The Fifth Circuit reasoned that the insured's interpretation of "sudden" as meaning unexpected created a redundancy because "accidental" already conveyed unexpected. Therefore, it concluded, "[t]o define sudden as meaning only unexpected or unintended, and therefore a mere restatement

of accidental, would render the suddenness requirement mere surplusage." *Id.*

The flaw in *Mustang Tractor*'s reasoning is the court's assumption that "accidental" means unforeseen or unexpected under Texas law, for which proposition the court cited *Republic National Life Insurance Co. v. Heyward*, 536 S.W.2d 549, 554 (Tex.1976). However, that case is inapposite.[4] Texas courts generally interpret the word "accidental" to mean "unintended" in the insurance context,[5] and cases from other jurisdictions support the view that "accidental" adds an element of intent that is missing from "sudden" or "unexpected." *See, e.g., Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 124 Wash.2d 536, 882 P.2d 703, 721 (1994) (citing *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1194 (3d Cir.1991)). In addition, leading dictionaries primarily define "accidental" as unintended, without an element of foreseeability.[6] While many

---

**3.** *See Webster's Third New International Dictionary* 2284 (Philip B. Gove ed., 1986) (defining "sudden" as: "**1a.** happening without previous notice or with very brief notice; coming or occurring unexpectedly: not seen or prepared for [usage examples omitted]"; *The American Heritage Dictionary of the English Language* 1286 (William Morris ed., 1973) (defining "sudden" as: "**1.** Happening without warning; unforeseen."); *Black's Law Dictionary* 1432 (6th ed.1990) (defining "sudden" as: "Happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for."). Even in the Random House definition quoted by the majority, a temporal element exists in only one of the three meanings provided. *See Random House Dictionary of the English Language* 1900 (Stuart B. Flexner ed., 1987) (defining "sudden" as "happening, coming, made, or done *quickly, without warning, or unexpectedly* ") (emphasis added).

**4.** *Heyward* held that whether a killing is "accidental" within the terms of a life insurance policy is determined from the viewpoint of the insured, not the viewpoint of the one who does the killing; the test is whether the insured should have reasonably anticipated that his conduct would bring about his own death. *See Heyward*, 536 S.W.2d at 552–54. *Heyward* thus does not control the definition of "accidental" as that word is used in the "sud-

den and accidental" exception to the pollution exclusion.

**5.** *See Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 827–28 (Tex.1997) (insured's conduct not an "accident" for purposes of insurance policy because insured acted intentionally and purposefully in copying photographs of plaintiff and showing them to friends); *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973) ("Where acts are voluntary and intentional and the injury is the natural result of the act, the result was not caused by accident") (quoting *Thomason v. United States Fidelity & Guar. Co.*, 248 F.2d 417 (5th Cir.1957)); *Wessinger v. Fire Ins. Exch.*, 949 S.W.2d 834, 837 (Tex. App.—Dallas 1997, no pet.) (if acts producing alleged injuries were committed involuntarily and unintentionally, results of acts are accidental); *but see Mesa Operating Co. v. California Union Ins. Co.*, 986 S.W.2d 749, 755–56 (Tex.App.—Dallas 1999, no pet. h.) ("The term "accidental" already encompasses the concepts of being unexpected and unintended.") (citing *Mustang Tractor*, 76 F.3d at 92).

**6.** *See Webster's Third New International Dictionary* 11 (Philip B. Gove ed., 1986) (defining "accidental" as: "**2b.** happening or ensuing without design, intent, or obvious motivation or through inattention or carelessness < ˜collision> < ˜shooting> < ˜loss>."); *A Dictio-*

*also* define "accident" as an unforeseeable occurrence, these definitions are often secondary.[7] Finally, insurance policies often use words that have similar meanings, such as in the qualified pollution exclusion where the words "discharge, dispersal, release or escape" are all used to describe potentially polluting events. *See New Castle County,* 933 F.2d at 1194.

As Gulf Metals points out in its brief, it is not redundant to describe an event as both "unexpected" and "unintended," since the latter term describes subjective hopes or desires, while the former addresses the more objective concept of what is foreseeable or foreseen. Thus, winning a lottery jackpot could be described as unexpected but not unintended, while receiving a speeding ticket for driving far above the posted speed limit would be unintended but probably not unexpected. While the terms "sudden" and "accidental" can overlap to some degree, nothing about the present context makes Gulf Metals' interpretation unreasonable; this is particularly so in light of the well-settled rule that exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured. *See National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex.1976). Reading "sudden and accidental" to mean "unexpected and unintended" is reasonable. Because *Mustang Tractor*'s contrary conclusion rests upon a flawed assumption, I believe the majority's reliance on that case to be misplaced.

The redundancy relied upon by the *Mustang Tractor* court is created only if one begins with the assumption that "acci-

dental" necessarily connotes "unforeseen" in addition to its natural meaning of "unintended." As discussed above, this interpretation is largely unsupported by relevant Texas authority. Nor is "sudden" required to contain a temporal element by either Texas caselaw or authoritative dictionaries. Thus, reading "sudden and accidental" to mean unexpected and unintended is reasonable, and the ambiguous exception must be interpreted in favor of the insured.

In *Balandran,* the supreme court proclaimed that surrounding circumstances evidence is admissible to determine whether an ambiguity exists. *Balandran* also sets a new and generous standard as to what can be considered a "reasonable interpretation" of an exception to a policy exclusion. Without the benefit of the supreme court's decision, the trial court granted summary judgment against the insured, holding that Gulf Metals' interpretation of "sudden and accidental" is unreasonable. I would reverse the summary judgment and remand the cause to the trial court to allow further discovery of evidence that agents of the appellee insurance companies represented to state insurance boards that the "sudden and accidental" exception to the pollution exclusion would not eliminate coverage as long as the pollution was not expected or intended from the standpoint of the insured.

---

nary of Modern Legal Usage 13 (Bryan A. Garner ed. 1995) ("In law, the usual distinction is that an *accident* occurs without the willful purpose of the person who causes it.") (contrasting "accident" with "mistake") (emphasis original).

7. *See, e.g., The Random House Dictionary of the English Language* 12 (Stuart B. Flexner ed., 1987) (defining "accident" as: **1.** an un-

desirable or unfortunate happening that occurs unintentionally and usually results in harm, injury, damage, or loss; casualty; mishap; *automobile accidents.* **2.** *Law* such a happening resulting in injury that is in no way the fault of the injured person for which compensation or indemnity is legally sought. **3.** any event that happens unexpectedly, without a deliberate plan or cause.").