# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00358-CV

**Russell H. Fish, III, individually and derivatively on behalf of
Texas Legislative Service, Partnership, Appellants**

**v.**

**Texas Legislative Service, Partnership; Andrew K. Fish; and John C. Fish, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
### NO. D-1-GN-08-002264, HONORABLE ERIC SHEPPERD, JUDGE PRESIDING

## CONCURRING AND DISSENTING OPINION

I concur with the majority decision in this case to affirm the trial court's summary judgment in part and to reverse in part the portion of the judgment concerning noncompliance with section 2.5 of the partnership agreement. I agree with the majority's conclusion that we must remand Russell's breach-of-contract claim because a fact issue exists concerning Russell's possible waiver of his right to enforce section 2.5, although the statute of limitations bars damages for any breach that accrued more than four years before this lawsuit was filed.[1] I write separately, however, because I respectfully dissent from the majority's conclusion that the clause in the contract

---

[1] I also agree with the majority's conclusions affirming the trial court's grant of summary judgment for Andrew and John on Russell's other claims, which concern access to the partnership's records and books, the sale of Janet's partnership interest, the partnership agreement's covenant not to compete, misappropriation of trade secrets, copyright infringement, and breaches of fiduciary duty.

addressing approval of partner salaries is unambiguous and requires the partners' unanimous agreement on partner salaries. Unlike the majority, I would conclude that section 2.5 of the 1979 partnership agreement is ambiguous, and I would also remand this issue to the trial court for the factfinder to determine the parties' intended meaning of the clause after consideration of the relevant extrinsic evidence.

To determine whether a contract is ambiguous, we apply the pertinent rules of interpretation to the instrument's face. *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951); *see also Moon Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394 (Tex. App.—Eastland 2007, no pet.) (noting that rules of interpretation may be utilized to determine if agreement is ambiguous but canons of construction do not apply to determine agreement's legal effect absent determination of ambiguity). If it is genuinely uncertain which one of two or more meanings is the proper meaning after applying the rules of interpretation, then the terms cannot be given a certain or definite *legal* meaning, and the contract is ambiguous. *Universal C.I.T.*, 243 S.W.2d at 157. We must decide whether the contract is ambiguous by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). To ascertain the true intention of the parties as expressed in the instrument, we must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). No single provision taken alone should control—instead, all the provisions must be considered with reference to the

2

entire agreement. *Id.* In this case, an examination of the text of section 2.5, the contract as a whole, and the surrounding objective circumstances demonstrates that the contract is ambiguous.

According to Oscar Wilde, "consistency is the last refuge of the unimaginative." Oscar Wilde, *The Relation of Dress to Art*, Pall Mall Gazette (London), February 23, 1885, *reprinted in Aristotle at Afternoon Tea: The Rare Oscar Wilde*, 52 (John Wyse Jackson ed., 1991). Imagination is precisely what a well-drafted contract avoids—variety and creativity lead to ambiguity. When it comes to contracts, the view attributed to Francis Bacon that "consistency is the foundation of virtue" is more germane. This contract fails the consistency test.

Section 2.5 provides that "the partners shall receive such monthly salaries as the partners mutually agree shall be paid." The majority's view of section 2.5's meaning is not an unreasonable interpretation of the phrase "the partners mutually agree." The majority begins its interpretation of the phrase "mutually agree" by examining the plain, ordinary, and commonly understood meaning of the term "mutual" and concludes that the term "connotes unanimous agreement of the partners, not a majority in interest." *Fish v. Texas Legislative Serv., P'ship*, No. 03-10-00358-CV, slip op. at 13-14 (Tex. App.—Austin Jan. 27, 2012, no pet. h.) (mem. op.), *available at* http://www.3dcoa.courts.state.tx.us. In my view, however, the phrase "the partners mutually agree" does not unambiguously mandate unanimous consent among all the partners, each with varying percentages of interest in the partnership.

There are a number of inconsistencies in the terms used in the contract. Nowhere in the contract are the terms "mutually" or "mutually agree" defined. In some provisions, the contract unambiguously refers to "all of the partners" or "one hundred percent (100%) of the interest of

3

the partners." In other provisions, the contract unambiguously refers to a less than unanimous interest by referring to "the majority in interest of the partners," which it defines as "those partners owning more than fifty percent (50%) of the capital interest." This variety in usage, coupled with the lack of a definition for the term "mutually agree," results in ambiguity. The majority concludes differently, asserting that the variety in terms does not result in ambiguity because it can be explained by the need to contrast a 100%-agreement requirement with a 75%-agreement requirement in a particular section. But the majority does not explain why section 1.3 states that "[t]he partnership shall also carry on any business activity which may be lawfully done by a partnership in the State of Texas *upon agreement of all the partners*," instead of "upon mutual agreement of the partners." (Emphasis added.) "Agreement of all the partners" unambiguously conveys a requirement of unanimity, which supports my conclusion discussed below that the phrase "the partners mutually agree" reasonably could convey a requirement of less than unanimity.

I find that several ambiguities are raised by the text of section 2.5 itself. First, if we read "partners" as all interest holders as defined in section 1.1 and we use the majority's interpretation of "mutually agree," then section 2.5 must be read to require that all interest holders, whether working in the partnership or not, must receive a monthly salary (i.e., "the partners shall receive such monthly salaries") and that each one must agree upon each of the others' salaries. Neither of the parties asserts that this is the case, although both sides argue that section 2.5 is unambiguous. Second, there is a tension between the terms "mutually" and "agree" that creates an ambiguity. One commentator has noted that the term "mutual agreement" is a redundancy. Bryan A. Garner, *Garner's Dictionary of Legal Usage* 594 (3rd ed. 2011). But if we presume, as we must,

4

that the parties intended each word to have meaning, then "mutually" must somehow modify "agree." *See Alpert v. Riley*, 274 S.W.3d 277, 288 (Tex. App.—Houston [1st Dist.] 2008, pet denied) ("[C]ourts should presume that words that follow one another are not intended to be redundant." (citing *Gulf Metals Indus., Inc. v. Chicago Ins. Co.*, 993 S.W.2d 800, 805 (Tex. App.—Austin 1999, pet. denied))).

The word "agree," when used as an intransitive verb as it is in the partnership agreement, means "to give assent: express approval," and it "suggests an accord, harmony, or compatibility arrived at by a settling of differences . . . or by acquiescence where there was or might have been opposition or contention." *Webster's Third New International Dictionary* 43 (2002). This definition supports the majority's reading of the phrase "the partners mutually agree" as requiring unanimous consent of all the partners. Under the majority's interpretation, if any partner opposes another partner's salary, the opposing partner has veto power. But I believe there is a nuance to the term "mutual" that allows a plain reading of it to encompass the idea that each partner's agreement or disagreement is valued in proportion to his or her share of the partnership. One definition of the term "mutual" used by the majority is "reciprocal," and one definition of "reciprocal" is "serving to reciprocate: consisting of or functioning as a return in kind." *Id.* at 1895. "Reciprocate," in turn, means "to return in kind or degree" or "to give back usu. in kind or in quantity." *Id.* To me, this implies that each partner would contribute his or her agreement (or lack thereof) to partner salaries in proportion to his or her share in the partnership. In other words, a partner with a minority interest could not veto an agreement reached by a majority interest of the other partners.

But even if the majority's view of the plain meaning of "mutual" is correct, we must look beyond the plain meaning of the words if it definitely appears that the plain meaning would

5

defeat the parties' intent, as evidenced by the entire agreement. *See Dynegy Midstream Servs. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *Moon Royalty*, 244 S.W.3d at 394. We also may consider the "surrounding circumstances that inform, rather than vary from or contradict, the contract text" to aid us in determining whether the language of the contract appears to be capable of only a single meaning. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, __ S.W. 3d __, No. 08-0890, 2011 WL 3796361, at *4 (Tex. Aug. 26, 2011). "Those circumstances include . . . 'the commercial or other setting in which the contract was negotiated *and other objectively determinable factors* that give a context to the transaction between the parties.'" *Id.* (quoting 11 Richard A. Lord, Williston on Contracts § 32.7 (4th ed. 1999)) (emphasis added); *see also Sun Oil v. Madeley*, 626 S.W.2d 726, 731 & n.5 (Tex. 1981) (explaining that while extrinsic evidence is not admissible to render unambiguous contract ambiguous, courts may consider "surrounding circumstances known to the parties at the time of [the contract's] execution" to aid them in determining whether contract language appears to be capable of only one meaning (quoting 4 Williston on Contracts § 609 (3rd ed. 1961))). In this case, when we consider the contract as a whole in light of the circumstances present when the contract was entered, and harmonize all its provisions so that none is rendered meaningless or moot, it becomes apparent that the interplay of section 2.5 with section 3.1 renders section 2.5 "fairly susceptible of more than one legal meaning or construction." *Id.* at 732. Consequently, the contract does not clearly disclose the parties' intention—it is ambiguous.

Section 3.1 of the partnership agreement concerns the manager of the business. This section provides for the selection of the manager by at least a majority in interest of the partners, establishes three acts that the manager may perform on behalf of the partnership only with the

6

consent of a majority in interest, restricts the manager's liability to the partners, and establishes who may sign checks on the partnership bank accounts. Section 3.11 establishes that James Fish would be the manager as of July 1, 1979, and "continuing thereafter so long as there is the approval of a *majority in interest* of the partners." (Emphasis added.) Section 3.11 also provides that if James Fish decided not to continue as manager or no longer had "the approval of a *majority in interest* of the partners to serve, a new manager shall be selected by the consent of a *majority in interest* of the partners" if the new manager was a partner.[2] (Emphasis added.) This section would be rendered meaningless if a partner with a minority interest could veto paying a salary to a manager who had the approval of a majority in interest of the partners.

In addition, the manager chosen by a majority in interest of the partners is vested with nearly unlimited power. The only limitations on the manager's power are found in sections 3.12 and 3.3. Section 3.12 establishes that the manager must have the consent of a majority in interest of the partnership to do the following: (1) borrow or lend money, (2) purchase equipment or consumable supplies costing more than $10,000, and (3) execute any mortgage, bond, or lease except for the principal office premises. Section 3.3 allows the manager to sign checks on the partnership bank accounts, but states that any other partner or employee who signs checks is to be "mutually designated" by the partners.[3] There is no limitation on the manager's ability to set the salaries or bonuses of the employees of the business. Under the majority's interpretation of the contract, a

---

[2] As explained in the majority opinion, hiring a non-partner as manager requires consent of two-thirds of the partnership interests.

[3] I read "mutually designate" similarly to "mutually agree" and would conclude that a partner's contribution to the decision to "mutually designate" who could sign checks would be proportionate to that partner's interest in the partnership.

7

manager could be chosen by a majority in interest of the partners and have his or her salary vetoed by a minority partner. The manager could then hire his or her non-partner spouse as an employee and pay that employee whatever amount the manager deemed appropriate, as long as it did not result in the disapproval of a majority in interest of the partners. When we read sections 2.5 and 3 together, as we must to give meaning to both provisions, the potential conflict between the two sections created by the phrase "the partners mutually agree" demonstrates that ambiguity exists surrounding the parties' intent. *See Coker*, 650 S.W.2d at 394.

The surrounding circumstances known to the parties at the time of the contract's execution also support the reasonableness of this second interpretation of the phrase "mutually agree." In 1979, the parties to the contract were partners in a family business, in which some partners worked and others did not. The partners did not share equally in the partnership; instead, some partners held a substantial percentage interest (as much as 25%), while others held less than a 5% share. *See Houston Exploration Co.*, 2011 WL 3796361, at *4 (considering setting in which contract was negotiated when construing contract); *see also id.* at *7 & n.2 (Jefferson, C.J., dissenting) (noting permissibility of considering objectively determinable factors such as parties' experience, bargaining position, and relative value of interest at stake). When the partnership agreement was executed in 1979, it designated the parties' uncle, James C. Fish, as the manager. At least between 1974 and 1979, Russell Jr., the parties' father, had been TLS's manager.[4] Before Russell Jr.'s tenure, the first manager had been the parties' grandfather Walter, who started the

---

[4] The 1974 partnership agreement establishes Russell Jr. as the "supervisor," and the supervisor position carried the same limitations as the manager position in the 1979 agreement. James Fish testified that Russell took over as managing partner at approximately the beginning of 1965.

business in 1924. The previous partnership agreement executed in 1974 contained the same language about "mutual" agreement on partner salaries that is at issue here. When the 1974 partnership agreement was executed, Russell Jr. and his wife Janet (the parties' mother) each had a 25% interest in the partnership and they were co-trustees for the parties who had an 8-1/3% interest each, meaning that together Russell Jr. and Janet controlled 75% of the partnership interest.

The parties' uncle James testified that historically only those partners who worked in the business would receive a salary and the managing partner set the salaries. He further explained that the salaries of partners who worked in the business historically had not required the agreement of all partners. James testified that the salaries of partners who worked in the business had been set by TLS's managing partner since 1924.[5] He testified that Russell Jr. had set his own salary and that of the other partners working in the business when Russell Jr. was the manager of TLS. Andrew also testified at his deposition and stated in his affidavit that the prior managers had set their own salaries and those of the other partners working in the business without seeking the approval of those partners not working at TLS. Andrew testified that it was the manager's function to set salaries even though that was not expressly stated in the partnership agreement. He testified that "the provision [section 2.5] in the partnership agreement had to do with retiring managing partners and provisions if salaries were to be paid to other partners, but there was no express provision dealing with salaries of employees or managing partners." Andrew and John both stated in their affidavits that their father (and subsequently, their uncle) never asked any of the partners who

---

[5] James also testified that he followed the same practice when he became managing partner and set his own salary without a vote from any of the other partners.

did not work at TLS to approve any of the salaries for the partners working at TLS. Andrew further testified at his deposition that the prior practice when his father had been managing partner (which was continued by his uncle) was that partners working in the business earned more from TLS than partners who were not working in the business.[6]

In 1979, when James became manager, the partners working in the business controlled a majority in interest (66-2/3%) of the partnership:

| | |
|---|---|
| Janet | 25% |
| James | 16-2/3% |
| Andrew | 12-1/2% |
| James as trustee for his children | 4-1/6% (for each of his 3 children).[7] |

All the partners working in the business were on salary. James continued setting the salaries for the partners working in the business, just as Russell Jr. did when he was the manager, and the partners

---

[6] For the purpose of determining whether the language in section 2.5 is ambiguous, I consider only the objective circumstances existing at the time of the contract's execution—the practice followed by the partnership up to the time of the agreement's execution in 1979. If we were remanding Russell's breach-of-contract claim to the trial court for the factfinder to determine the meaning of section 2.5, then the factfinder could consider the extrinsic evidence of the partners' subjective intent, including subsequent conduct. *See National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam) ("Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." (citation omitted)); *Sun Oil v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981) (considering evidence of parties' experience, bargaining position, and relative value of interest at stake when deciding contract was unambiguous and finding appellate court erred by considering subsequent conduct to interpret unambiguous contract).

[7] Andrew testified that Janet worked at TLS from the 1960s until 1988, at which point she was no longer regularly scheduled as an employee during sessions because of a shift in the business's production schedule, although she continued to draw a salary until 1994 and may have worked some. Andrew testified that he started working at TLS in 1976. James testified that Janet and Andrew were both working at TLS when James took over as the manager in 1979. John testified that he began working in the business in approximately 1981.

working in the business controlled a majority in interest of the business, just as they did when Russell Jr. was the manager. Thus, the circumstances at the time the 1979 agreement was signed are consistent with the idea that "mutual" agreement upon salaries to be paid to partners meant agreement of a majority in interest of the partnership. Consequently, I conclude that when the contract is considered as a whole and in light of the circumstances surrounding its execution, section 2.5 is ambiguous because agreement of a majority in interest of the partners is another reasonable interpretation of the phrase "mutually agree." When more than one reasonable interpretation of a contract exists, there is a fact issue concerning the parties' intent. *See Columbia Gas*, 940 S.W.2d at 588.

Because I disagree with the majority's conclusion that the agreement is unambiguous and requires unanimous consent for partner salaries, and I would remand the breach-of-contract claim to the trial court to allow the factfinder to determine the parties' true intent, I respectfully dissent. Because I agree with the majority's disposition of the other issues involved, including the issue of waiver, I respectfully concur in the remainder of the majority's decision to affirm in part and to reverse and remand in part.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Filed: January 27, 2012

11